CALVIN CORLE, executor of Peter W. Young, deceased,

v.

LYDIA Y. MONKHOUSE et al.

1. A contract to make a loan of money, founded upon a sufficient considera-tion, and so expressed as to show what each party bound himself to do, is within the contracting capacity of the parties, and just as binding as a contract in respect to any other subject-matter.

2. A consideration sufficient to support a promise may consist of either a benefit to the promisor or a detriment to the promisee.

3. An executor may do anything within the scope of his powers without being personally liable for the consequences of his acts, provided he acts in good faith and with ordinary discretion.

4. A valid gift of a promissory note, held by the donor against another person, may be made by simple delivery and without writing.

5. A gift *inter vivos* becomes perfect by delivery and acceptance, and a title thus acquired is just as perfect as a title acquired by purchase.

On exceptions to the account of complainant as executor.

*Mr. Alvah A. Clark,* for the complainant.

*Mr. William Y. Johnson* and *Mr. William S. Gummere,* for Lydia Y. Monkhouse.

*Mr. Charles A. Reid,* for legatees under the will of Penelope Young, deceased.

VAN FLEET, V. C.

The questions which are to be decided in this case at this time, arise upon exceptions to an account filed in this court by the complainant as the executor of Peter W. Young, deceased. Originally the complainant's suit had two objects—*first,* to pro-cure a construction of certain parts of his testator's will, and, *second,* to get authority to settle his accounts in this court. Such of the questions arising on the will, as it was proper for the

court to decide on the complainant's application, have already been decided.   *Corle* v. *Monkhouse, 2 Dick. Ch. Rep. 72.*   The complainant has, with the permission of the court, filed an account here to which many exceptions have been taken.   All of them, except four, have, however, either been withdrawn or satisfactorily adjusted.   Three will now be decided.   The decision of the other must be deferred until additional facts are before the court.

The first of the three exceptions, which will now be considered, relates to the credit side of the account.   The complainant asks to be credited with the loss resulting from a loan made by him as executor, on bond and mortgage to David Hill, after the testator's death, pursuant, however, to directions, both oral and written, given to him by the testator in his lifetime.   The testator died on the 8th day of March, 1887, and the loan was made, and the bond and mortgage executed, on the 1st day of April following.   The facts which induced the complainant to make the loan may be summarized as follows :   Hill, the mortgagor, had married a niece of the testator.   The niece had requested her uncle, who was childless and a man of means, to help her husband buy a farm, and he had promised to do so.   On the 16th day of December, 1886, the testator and Hill started together to look at a farm near Copper Hill, in the county of Hunterdon, with a view of buying it.   On the way they were informed that a farm near Ringoes, in the same county, which had been offered for sale the day before, at public sale, had not been sold.   Thereupon the testator proposed that they should go and look at that farm first.   Hill assented and they went. After they had examined the buildings and the vendor had stated his price and terms of sale, the testator advised Hill to buy, saying : " You had better buy this farm to-day.   You will never be sorry for it."   Hill answered that he thought they had better wait a day or two, or until the following week, and see further about it.   The testator again said : "You better buy to-day.   You will never be sorry for it."   Hill replied : " It don't feel that I can pay quite so much for a farm.   I don't feel able to buy it.   I can't raise over $1,000, as I see things now."

Corle v. Monkhouse.

To this the testator answered: "If you can't raise but $1,000, and Mr. Rue [the vendor] will take a mortgage for half the purchase-money, I will see you through the rest." Hill, under the influence of this promise, consented to buy, and at once entered into a written contract, in the presence of the testator, for the purchase of the farm. He agreed to pay $7,600, one-half of which was to be secured by a first mortgage on the farm, and the other half was to be paid in cash on the delivery of the deed. One thousand five hundred and twenty dollars were agreed upon as the sum which should be paid as liquidated damages, in case either party failed to perform his part of the contract. Hill and the testator gave their promissory note to the vendor for $1,520, payable on the day the deed was to be delivered, with the understanding that the payment of the note should operate as a discharge of so much of the purchase-money as it represented.

In the early part of February, 1887, the testator was taken sick. He was then about eighty years of age. He had made his will in July, 1885, in which he appointed his wife and the complainant his executors. Soon after he was taken sick he told the complainant that he had been with Hill when Hill bought the farm, and that he had signed a paper by which he had bound himself for the purchase-money, and that if he did not live until the 1st day of April, the complainant must, as his executor, lend Hill $2,800. The complainant was unwilling to promise that he would do so, saying he wouldn't like to do it. He was afraid it would give trouble. The testator then called a witness, and repeated his direction, and charged the witness to see that the complainant complied with his wishes. Subsequently and on the 18th day of February, 1887, the testator signed a paper, addressed to his wife and the complainant as his executors, in these words, and delivered the paper to the complainant:

"I hereby order and direct you, if I do not live to do it myself, to carry out the agreement I have made with David Hill to lend him Twenty Eight Hundred dollars April 1st 1887, to be second mortgage on the farm lately purchased by him, at my request, of John Rue; he to take the first mortgage for one half of the purchase money."

These facts show conclusively that Hill purchased the farm at the testator's request, relying implicitly upon the testator's promise that he would lend him $2,800 to pay for it, and that if the testator had not so promised Hill would not have entered into the contract by which he became liable for $7,600. They also make it certain that the testator made his promise in entire good faith, fully understanding what he was doing, and with an earnest desire to help Hill; and that after he was taken sick he became extremely desirous, under a fear that he might not live to perform his promise in person, that it should be put in such form that, in case of his death, his representatives should be legally bound to perform it. It is entirely clear, as I think, that if he did not put himself under a legal obligation to do as he had promised, it was not because he did not want to do so, but because he did not know how to do it effectually.

There can be no doubt that if the testator was under a legal duty to lend Hill $2,800, the complainant, as his representative, was bound to perform that duty, and is consequently entitled to the credit he asks. The books say very little concerning contracts to make loans of money, but I suppose such a contract, founded upon a sufficient consideration, and so expressed as to plainly show just what each party bound himself to do, is, beyond question, within the contracting capacity of the parties, and just as binding as a contract in respect to any other subject-matter. I entertain no doubt if A promises B, in writing, that if B will purchase a certain tract of land, for a price named, he will lend B either the whole or a part of such price, for a certain period, and B makes a binding contract of purchase, in reliance on A's promise, that A thereby becomes legally bound to perform his promise. In such a case B's compliance with A's request to purchase, B thereby incurring an obligation that he would not have incurred but for A's promise, would constitute a sufficient consideration to support A's promise to lend the money. A consideration sufficient to support a promise may consist of either a benefit to the promisor or a detriment to the promisee; or, as defined by Mr. Justice Depue, in *Conover* v. *Stillwell, 5 Vr. 54, 56,* "a consideration emanating from some injury or inconvenience

to the one party, or from some benefit to the other party, is a valuable consideration." In my judgment, the evidence makes it clear that the testator was under a legal obligation to lend Hill $2,800, to assist him in paying for the farm. Hill bought the farm at his request. He bought a more expensive farm than he intended to buy, and thus charged against his future a greater debt than he thought a man of his means and capacity ought to incur, and he did this through the persuasion of the testator's promise that he would see him through the venture by lending him $2,800. The detriment or injury that Hill suffered, in consequence of the testator's promise, was that, in reliance on the testator's promise, he placed himself in a position where, if the testator did not keep his promise, he became liable to pay $1,520 as liquidated damages. This, as well as the request to purchase, constituted a good consideration for the testator's promise, and either was, in my opinion, sufficient to make his promise binding. The testator to protect Hill, in case he died before he made the loan himself, put his promise in writing. In his written direction to his executors he orders them, in case he does not live to do it himself, to carry out the agreement which he had made with Hill to lend him $2,800 on second mortgage on the farm which Hill had purchased of John Rue at his request. By this writing the testator admitted his promise, and likewise that it was founded on a consideration entirely sufficient to make it legally binding upon him. My conclusion therefore is, that the complainant in making the loan did nothing wrong, but, on the contrary, did that which the contract of his testator made it his duty to do.

But suppose we say that the testator's promise did not bind him, and that he was under no duty to make the loan, the question then will be, whether, in view of the actual condition of affairs by which the complainant was confronted, when he was called upon to decide whether he would make the loan or not, he did not, in making it, do just what any man of ordinary prudence and caution would, under like circumstances, have done? Or, stated in another form, whether, in view of the situation of the testator's estate, the complainant did not, in making the loan, do

that which, in the light of the facts then existing, would have seemed to a man of ordinary discernment and foresight to be best for the testator's estate? It must be remembered that we occupy the superior position in point of knowledge. We know what has happened, but the complainant, when he was required to act, could only see what was, but could not know what was to be. As to what would occur in the future he could neither know nor foresee, but we now know what has occurred. The testator, by becoming Hill's surety on the note of $1,520, had placed his estate in a situation where, if the loan was not made, his estate might be compelled to pay $1,520 without any certain prospect that its repayment could ever be enforced. Hill and his vendor were at liberty to carry out their contract though the loan was not made. In case that had been done, the vendor might have been compelled to take a mortgage for $1,280 more than his contract required him to take, but he could have protected himself against the additional risk thus incurred by requiring Hill to secure him by a mortgage on his chattels. If the complainant had refused to make the loan, it is obvious that it was clearly within the power of Hill and his vendor, by the use of perfectly legal means, to place the testator's estate in a position where it would be compelled to pay the $1,520. And I do not think it is too much to say that if the complainant had refused to keep his testator's promise, his refusal would, in view of the circumstances under which the promise was made, and the harmful consequences which would necessarily have resulted to Hill from its breach, have gone very far towards justifying the adoption of such means.

When the complainant was required to decide whether he would make the loan or not the testator's estate was in a position of hazard. The complainant could do nothing which would not be attended with risk. If he refused to make the loan he would not only violate his testator's promise, and thus possibly bring ruin upon the promisee, but he would, in addition, place his testator's estate in a situation where it was highly probable that it would sustain a loss of $1,520. If, on the other hand, he made the loan, he would keep his testator's promise, do as his testator

wanted him to do, give the help to Hill which the testator had promised when he induced him to enter into the contract for the purchase of the farm, get the security for the loan which the testator had promised to take, and thus put the testator's estate in a situation where, if the farm was worth what the testator believed it was, it would lose nothing.   The question the complainant was required to decide was certainly perplexing, if not difficult.   He was bound to decide it one way or the other, but not to exercise a faultless judgment.   No man can do that in every case.   All that the law required of the complainant was to give the question full and careful consideration, and then decide it according to the best judgment he could form.   So long as an executor acts in good faith and with ordinary discretion, and within the scope of his powers, his acts cannot be successfully assailed.   No man is infallible; the wisest make mistakes; and for that reason the law holds no man responsible for the consequences of his mistakes which are the result of the imperfection of human judgment, and do not proceed from fraud, gross carelessness or indifference to duty.   *Heisler* v. *Sharp, 17 Stew. Eq. 167, 172; S. C. on appeal, 18 Stew. Eq. 367.*   In my judgment, the complainant, in deciding to make the loan, acted wisely, and that if he had decided not to make it, there would have been more reason to question the wisdom of his judgment and the purity of his motives than there is now.

The next exception seeks to have the complainant charged with the amount of a promissory note which the testator at one time held against Rynear Herder.   Herder was the testator's brother-in-law, being a brother of the testator's wife.   The note was made about a year prior to the testator's death.   It was payable to the testator, but whether payable to him alone, or to his order, or to bearer, does not appear.   It has been destroyed.   The testator's widow, about three months after her husband's death, made a gift of it to the maker and he destroyed it.   The complainant swears that he never saw the note; that he did not find it among the testator's papers, and that he did not attempt to obtain possession of it because the testator, prior to his death, told him that he had given it to his wife and that he must not

ask her for it, nor make her any trouble about it. He further says, that on the 18th day of February, 1887, he made a list of the testator's securities, at his request, and that after the list was completed he called the testator's attention to the fact that he had omitted the Herder note, when the testator said: "I ain't got that note and don't you ask for it." Other facts, leading to the same conclusion, were testified to by other witnesses. The evidence, in my judgment, shows clearly and satisfactorily that the testator, some days prior to his death, delivered the note to his wife, with the intention of making a gift of it to her, and that she, from that time forth, retained possession of it until she delivered it to the maker.

But it is insisted that, though the fact may be that the testator delivered the note to his wife, with the intention of making a gift of it to her, still that nothing passed by such act, because a valid gift of a promissory note cannot be made by simple delivery, but that a donor in such a case, to give legal efficacy to his purpose, must, by a written transfer or some other equivalent act, pass the legal title to the donee. Some of the earlier cases so hold, but the doctrine established by the later cases, and now generally recognized as the true one, is, that a valid gift of a promissory note, held by the donor against another person, may be made by simple delivery, and without writing of any kind. Perhaps the most accurate statement of this doctrine, to be found in any of the cases, is that which was made by Chief-Justice Shaw, in *Parish* v. *Stone, 14 Pick. 198, 205,* where he said: " But whatever doubts may have existed, it has been decided, that as an assignment of a chose in action is now recognized as a good transfer of the equitable interest, and as such equitable assignment is manifested by a delivery over of the bond or other security for money, by a gift of such a bond, accompanied by an actual delivery of the bond, an equitable interest vests in the donee, and the executors of the donor, in whom the legal interest remains, are mere trustees for the donee, and bound to permit the donee to use their names, to enforce the payment of the bond at law." The cases establishing this doctrine, he also said, " all go on the assumption that a bond, note or other security, is a

Corle *v.* Monkhouse.

valid subsisting obligation for the payment of a sum of money, and the gift is, in effect, a gift of the money, by a gift and delivery of the instrument that shows its existence and affords the means of reducing it to possession." In the subsequent case of *Grover* v. *Grover, 24 Pick. 261,* the same doctrine was, in substance, laid down. There are many other cases in which this doctrine has been adopted as the rule of judgment. Several of them will be found cited in a note to section 24 of *1 Dan. Neg. Inst. 28.* Chancellor Green, sitting as ordinary, recognized it in *Edgerton* v. *Edgerton, 2 C. E. Gr. 419, 422.* In pronouncing his opinion in that case, he said that, while it was settled that a donor could not make a valid gift of his own note, it was otherwise with the note of a third person, which could be transferred by endorsement or delivery, and then cited *Parish* v. *Stone,* with other cases, as expressing the established doctrine of law on this subject. Under the proofs and the rule of law which must be applied in determining the rights of the parties, I think it is plain that the delivery of the note by the testator to his wife, with the intention of making a gift of it, constituted a good equitable assignment of the money due on the note, and consequently that no charge in respect to that money can be made against the complainant.

The last of the three exceptions raises the question, whether or not the complainant should be charged with $1,300 or $1,400, which, at the time of the testator's death, were in two pocketbooks in his desk where he kept his securities and other valuables. The complainant did not take possession of the money nor inventory it, because, as he testifies, the testator had told him, a few days before his death, that he had given it to his wife. The question is, Had the testator made a valid gift of the money to his wife? There can be no doubt that he intended to do so. Three witnesses swear that, during his last sickness, he repeatedly said that he intended to give all the money in his house at the time of his death to his wife. The complainant testifies that on the 4th day of March, 1887—the testator died on the 8th—the testator's wife came into the room where he lay in bed and asked him for some money, and that he directed her

to bring him his pocketbooks from the desk, and she did so; that the testator had on that day, as well as on several previous days, said to him that he intended to give all the money in his house at the time of his death to his wife; that after taking from one of the pocketbooks the sum his wife asked for, and giving it to her, he handed both pocketbooks to her, and then turned to him (the complainant) and said: " I give them to her now," and then added that when he was gone the complainant must not touch the money, appraise it, nor ask anything about it. The wife then put the pocketbooks back in the desk. Another witness testifies that he shaved the testator the next day, March 5th, and that the testator then told him, in the presence of the testator's wife, that he had given his money to his wife, it was her money, and she had possession of it, and that his wife, in response to this, said that she had taken the money but had not counted it.

No doubt can be entertained, I think, that if the declarations and acts just narrated are accepted as true—and there is nothing in the case which will justify even a strong suspicion that they ought not to be so accepted—a perfect gift *inter vivos* is shown. The act of the wife, in putting the money back into her husband's desk immediately after its delivery to her, was manifestly not done with the intention to decline the gift, nor to revoke it, nor for the purpose of destroying or giving up her right to the money. She manifestly put it there because that was the place where her husband kept his money, and also because she thought that it would be more secure there than in any other place in the house.

In view of the relation of the parties, the kind of people they were—they were both plain and uneducated, he a farmer and she a farmer's wife—their ignorance respecting the legal requisites of a valid gift and his physical condition at the time the gift was made, it appears to me that the act of the wife, in putting the money back in her husband's desk, was perfectly proper, reasonable and natural, and that if a different course of conduct had been attributed to her there might have been reason to suspect that an attempt was being made to establish a gift that had

not in fact been made. The proofs convince me that not only was there an intention here to make a gift, but also that such intention was executed in such manner as to transfer the title of the subject of the gift from the donor to the donee. In the language of Judge Wilde in *Grover* v. *Grover, 24 Pick. 261, 264:* " By delivery and acceptance the title passes, the gift becomes perfect, and is irrevocable. There is, therefore, no good reason why property thus acquired should not be protected as fully and effectually as property acquired by purchase." The most serious difficulty a widow usually encounters in attempting to maintain a gift made to her by her husband, is in showing, by clear and convincing evidence, that the subject of the gift was delivered to her in such manner as to work a change of title. The law wisely requires that the proof in such cases shall be of the most satisfactory kind. There is no difficulty on that score in this case. An actual and perfect delivery is shown. The only ground for doubt, that even subtlety can suggest, is, as it seems to me, that which grows out of the conduct of the wife in putting the money back in her husband's desk, but to hold that that act defeated the gift would obviously, in view of the special circumstances of the case, impute to the wife an intention that it is absolutely certain she did not entertain.

Counsel will be heard on the remaining exception as soon as the complainant's account is restated in conformity to the directions of this opinion, and the adjustments that were made, during the hearing, of such of the exceptions as were not withdrawn.