This bill is filed by the executors of the estate of George K. Breintnall, deceased, to have their rights and duties declared under a will and four codicils thereto, and complainants have made parties defendants, ten individuals who are pecuniary legatees under the eleventh clause of the will (hereinafter, for convenience, referred to as individual legatees), and also six charitable institutions also mentioned in said eleventh clause (hereinafter, for convenience, referred to as ultimate legatees), as well as six annuitants mentioned in the third codicil annexed to the will (hereinafter, for convenience, referred to as annuitants).
A construction of the eleventh paragraph aforesaid is necessary in order to give to complainant the advice sought for. It reads as follows:
"Eleventh: I give, devise and bequeath all the rest, residue and remainder of my Estate, real, personal and mixed, whatsoever and wheresoever situate, in possession or in expectancy, unto the said Frank Disston (my wife's son) and the Girard Trust Company, their Heirs, Executors, Administrators, Assigns and Successors, in trust nevertheless, to collect, receive and recover the rents, income and profits thereof, and to pay the net income thereof unto my said wife, Kate Ella Breintnall, for and during the term of her natural life for her sole and separate use, free from her debts, contracts, engagements or assignments, and free from anticipation, attachment, or execution; and from and immediately after the decease of my said wife, Kate Ella Breintnall, to distribute and pay over out of the said residue of the principal and any unexpended *Page 508 
income, as follows: to my intimate friends, Ella Frances Hart, the sum of Fifteen thousand Dollars; to Margaret Wellwood Holmes, wife of Gerald Holmes, the sum of Fifteen thousand Dollars; and to Emma May Anderson the sum of Fifteen thousand Dollars; and, in addition to what I have given before, to pay over to the children of my said uncle, General R. Heber Breintnall, as follows: To Lillie Nelson Dane the sum of Fifteen thousand Dollars; to Sophia Augusta Sanderson the sum of Fifteen thousand dollars; to Eugene Herbert Breintnall the sum of Five thousand Dollars; and to Llewellyn Breintnall the sum of Five thousand Dollars; and to my said cousins, Louisa F. Heffern the sum of Fifteen thousand Dollars; to Louise Heffern the sum of Fifteen thousand Dollars; to Anna Constance Groton the sum of Fifteen thousand Dollars; and to Philip Powell Wagner the sum of Five thousand Dollars; and after the death of my said wife, Kate Ella Breintnall, and the above mentioned payments made out of the residue of my Estate, which are in addition to what I have previously given, I order and direct that the remaining residue of principal and unexpended income be distributed and paid over to certain of the beneficiaries before named, to wit: the `Children's Seashore House at Atlantic City for Invalid Children,' the `Home for Aged Couples,' `The Masonic Home of Pennsylvania,' the `Sanitarium Association of Philadelphia,' the `Philadelphia Home for Incurables,' and the `Pennsylvania Institution for the Instruction of the Blind,' in even and equal shares."
The wife of the testator predeceased him, her demise occurring in January of 1920 and that of testator in September of 1927.
After the death of Mrs. Breintnall, testator, on April of 1926, executed a codicil to his will, creating six annuities, to be paid to the annuitants in varying sums for the terms of their respective lives.
After the death of the testator, the will and codicils having been duly probated, the executors proceeded to convert the assets of the estate into cash, with the exception of a $10,000 mortgage on property situate in Margate City, New Jersey, and real estate in Atlantic City, New Jersey, and Philadelphia, Pennsylvania.
In September of 1929 the executors filed their first account, which was allowed by decree of the orphans court of Atlantic county, and the executors, in October of 1929, paid the pecuniary legacies given by the eleventh clause of the will aforesaid, having previously paid, satisfied or turned over the specific and general devises and legacies mentioned *Page 509 
in the will and codicils, and in November of 1929, the executors also made a partial distribution to the six charitable institutions, the ultimate residuary legatees named in the eleventh clause of the will aforesaid; this partial payment consisting of the sum of $10,000 in cash to each of said ultimate legatees, and at the same time, the executors assigned to a trustee for said ultimate legatees a mortgage of $150,000 covering property on the southeast corner of Twelfth and Sansom streets in Philadelphia.
The executors reserved the remaining assets for the payment of annuities given by the codicil of April, 1926, as well as for contingent expenses in operating the remaining real estate. These remaining assets had an approximate value of over $1,100,000, of which $110,000 was in cash; $10,000 on the Margate City mortgage aforesaid; $298,500 ground rents on the Eleventh and Chestnut streets property aforesaid and the balance in real estate situate at Thirteenth and Arch streets, Philadelphia, Pennsylvania, and Park Place and Pacific avenues in Atlantic City. This real estate was appraised at $940,000 and was, as to the Philadelphia property, subject to a mortgage of $250,000.
It will be observed that the remaining estate in the hands of the executors was in excellent condition, both as to liquidity and amount, and that the executors had assets out of which to pay the annuities, which annuities then amounted to practically $11,000 a year, as well as an excellent reserve. The executors set up on their books a participation in the ground rents on the Chestnut street property for the payment of the annuities and paid them in full up to and including January 1st, 1933, totaling $59,350, but there is now due the annuitants, as of February 1st, 1934, the sum of $10,920 for arrearages.
Going back into the events which succeeded the distribution to legatees, made in October and November of 1929, shortly thereafter, we find the executors confronted with the national depression which ensued, with the consequent and unforseeable shrinkage of assets. They were compelled to take back the Eleventh and Chestnut streets property by *Page 510 
reason of the bankruptcy of Whelan Company, and there was a consequent loss of ground rents out of which the annuities were to be paid. The real estate did not bring in sufficient income to pay carrying charges and it is anticipated that for the current year the shortage on this item will be $3,000.
The annuitants demand that they be paid, the ultimate legatees have refused to make refunds, the executors ask for and are entitled to the aid of this court in order that they may be advised what to do.
The ultimate residuary legatees say that the executors had no right, in October of 1929, to pay to the ten individual legatees the $135,000 covering their pecuniary bequests as set forth in the Eleventh paragraph aforesaid, and that if such payment had not been made, the executors would have had the income therefrom to apply to the payment of annuities and that the ultimate residuary estate to which the six charities will succeed would have been enhanced, and that the executors should be surcharged.
This reasoning does not appeal to the conscience of a court of equity under the circumstances, particularly in view of the fact that the six charities, at the time of that distribution, received on account of their ultimate legacies, $60,000 in cash and participation in a $150,000 mortgage.
Unless the executors are to be charged with prescience, and they are not, they were amply justified in law and in fact in making the distribution of 1929.
The intention of the testator, at the time of the making of the will, is clearly set forth therein; he says in the eleventh paragraph, "and from and immediately after the decease of my said wife, Kate Ella Breintnall, to distribute and pay over" to the ten individuals their pecuniary bequests, and those individuals, in the light of the then apparent financial condition of the estate, had a right to demand payment as provided for in the will, but even had there been no such provision therein, the estate being apparently amply able to pay and set up a reserve for the annuities, they had a right to demand distribution. *Page 511 
In support of this contention, in the case of Macy v.Mercantile Trust Co., 68 N.J. Eq. 235, Vice-Chancellor Emery said:
"In the absence of any directions in a will as to the time or manner of the payment of the residuary legacies, the general rule is that the residuary legatee has a right to insist that before the end of the first year after testator's death the executors shall, if possible, convert all the assets into money, pay the debts, funeral and testamentary expenses, and hand over the clear residue to the residuary legatee."
At the time of the payment of these legacies ample assets were in the hands of the executors to provide for the annuities given under the codicil of April 10th, 1926, and the legatees were entitled to their respective legacies.
See, also, 24 Corp. Jur. 475, where the following statement is made:
"The necessity of retaining funds for a particular purpose furnishes no occasion or excuse for delaying the settlement of the balance of the estate and the payment of the legacies which are due, there being sufficient funds for the payment of all legacies whether due or not."
It must not be overlooked that Mrs. Breintnall, having predeceased her husband, the residuary estate created by the will in favor of the ten individuals vested. See Fisch v. Fisch,105 N.J. Eq. 746, where Vice-Chancellor Church said, in part:
"Where there is a provision for a life estate and a remainder, the postponement of the vesting in possession of the remainder is merely for the purpose of providing for the life estate and upon the elimination of that estate in any manner at all the remainder vests."
See Pedrajas v. Bloomfield Trust Co., 101 N.J. Eq. 105,
affirmed by the court of errors and appeals in Ibid. 803.
It is apparent that under the law and facts as of 1929, the executors had not only a right but a duty to make distribution as they did. There is not even an indication of any negligence on their part.
"All that the executors were required to do was simply *Page 512 
to do what any man of ordinary prudence and caution would, under the circumstances, have done. So long as the executor acts in good faith, with ordinary discretion and within the scope of his powers, his acts cannot be successfully assailed. No man is infallible, the wisest make mistakes, but the law holds no man responsible for the consequences of his mistakes which are the result of the imperfection of human judgment, and do not proceed from fraud, gross carelessness or indifference to duty."Heisler v. Sharp's Ex'rs, 44 N.J. Eq. 167; approved in In reCorn Exchange National Bank and Trust Co., 109 N.J. Eq. 169.
The theory upon which equity relieves executors in cases such as this is not upon mistake either in law or fact on their part, but on the theory of accident.
In Merritt v. Merritt, 43 N.J. Eq. 11, the court dealt with the question of a deficiency of moneys invested to provide an annuity and in this case it appeared that when the corpus was invested the legal rate of interest was seven per cent. and thereafter reduced to six per cent. and that as a result thereof and other circumstances, sufficient moneys were not realized to enable the executors to pay the annuity and the court ordered the deficiency to be made up against the residuary legatees on the theory of accident.
Professor Pomeroy, in the fourth edition of his work, page 1702, section 837, says:
"There are other specific instances of the jurisdiction which must be referred to accident as their occasion. It will be sufficient to mention them in the briefest manner, and it will be seen that they fall under the general principle stated in the introductory paragraphs of this section. An executor or administrator will be relieved in equity from many liabilities arising from unforseen and unexpected circumstances in the nature of accidents, where he has acted in good faith and with reasonable care, although no remedy was given by the common law. Thus, where an executor or administrator has paid debts or legacies in full, supposing the assets were sufficient and it turns out that there is a deficiency of assets, equity will grant the remedies necessary *Page 513 
to relieve him from the legal liability." Citing Lothrop v.Duffield (Mich.), 96 N.W. Rep. 577; Hartley v. Inness,137 Mo. App. 420; 118 S.W. Rep. 1168; Edwards v. Freeman, 2 P. Wms.435, 447; Hawkins v. Day, Amb. 160; Jones v. Lewis, 2 Ves.Sr. 240; Clough v. Bond, 3 Myl. C. 490; Poole v. Ray, 1 P.Wms. 355.
In 24 C.J. 540 § 1424 it is held:
"Equity, however, will usually give relief and compel the legatee or distributee to refund his pro rata share of the deficiency in the proportion to the amount he has received from the estate, although no refunding bond has been given, where the representative acted in good faith and with due care and diligence in making the payments or distribution, honestly believing the assets sufficient, and the deficiency was caused by no fault on his part."
In Harris v. White, 5 N.J. Law 495, the court, in discussing refunding bonds, said:
"But yet, this refunding bond does not create the duty or obligation to refund; that exists in the fundamental principles of the law itself; it is the condition or trust (says Gilbert in his Lex Proetoria) upon which the legatee receives the legacy, and the bond is merely to secure the performance of that condition or trust; and, therefore, if such bond should not be taken, it does by no means follow that the duty ceases, or that the obligation is discharged.
"Hence we find that if a legacy be decreed in chancery, though there be no bond taken, yet if there be a failure of assets, the common justice of the court will compel the legatee to refund. 1Vern. 90."
It is conceded by all parties in interest that the annuities must be paid and that they have priority over all the legatees, either individuals or charities, mentioned in the eleventh paragraph aforesaid, but the ultimate legatees contend that they should not be compelled to refund at this time, at least.
What is the standing of the ten individual legatees and the six charitable institutions, as fixed by law? If there is to be a refund, from whom must it first come?
What the testator did in the eleventh paragraph was to *Page 514 
incorporate, in what he termed a residuary clause, ten general bequests and a payment to six charities out of the residue then remaining, and under these circumstances, as between the ten individuals and the six charities, the individuals have general legacies and the charities residuary legacies. Page Wills 2185
§ 1312.
The individual legatees mentioned in the eleventh paragraph, therefore, have general legacies, and the charities mentioned therein residuary legacies, but even if this proposition were not so, still the law is that if there are a number of residuary clauses, the one which is last will abate first, so that the charities must abate before the individual legacies. Page Wills2185 § 1312.
Again, if testator gives certain legacies, then provides for a residue out of which certain other legacies are to be paid, and then provides for the residue thus obtained, the legacies payable out of the first residue will have priority over the second residuary legacy. Page Wills 4276 § 878, citing Lewin v.Lewin, 2 Ves. Sr. 415.
It is thus apparent that if there is to be a refund, it must first come from the six charities.
It is observed that the testator made no provision in his will as to any fund out of which the annuities were to be paid and that he did not set aside any fund for that purpose, so that the general estate is charged with their payment, corpus and income. In re Hardy, 86 N.J. Eq. 405.
Thus, the ultimate result is that the annuities must be paid and that the executors are not to be made personally to provide the means of payment. Shall the fund to secure the annuities be raised out of corpus, the assets admittedly in the hands of the executors, consisting of real estate, and thus permit the possibility that the distribution already made to the six charities be undisturbed? I doubt the wisdom of this course or the equity of so doing. The evidence on the part of the executors, which is undisputed, is that on the present market, great loss would be incurred on a forced sale thereof and that a sufficient sum would not be realized, even with the sacrifice. The annuitants are entitled to speedy relief, *Page 515 
which would not permit of sufficient time to do more than advertise and sell the real estate at public auction. The ten individual legatees are entitled to protection against a sacrifice of assets, less they have to respond to a further deficiency. The six charitable institutions are entitled to the balance of the estate after the death of the last annuitant and should be protected against a loss of the retained assets.
The annuities being a charge on both the principal and income of the estate and the principal in the hands of the executors not being, under present conditions, satisfactory or sufficient to take care of the annuitants, it seems to me that what the court should do in fairness to all parties is to put in the hands of the executors an immediate amount of assets necessary to meet the payment of the annuitants, i.e., increase the existing assets, which have proved insufficient. This may be done by decreeing a refund of the $60,000 and the $150,000 mortgage now in the hands of the ultimate residuary legatees, and if that is insufficient, then a pro rata refund by the ten individual legatees.
If the six charitable institutions are willing that the $60,000 and the $150,000 mortgage, or so much thereof as may be necessary, be used to purchase annuities for the annuitants, and they accept such proposed annuities, then the remaining estate in the hands of the executors may be immediately turned over to the ultimate residuary legatees, the charities, or, it may be that the annuitants would prefer the present value of their annuities. If so, with the consent of the ultimate legatees, they may be purchased and the residue of the estate turned over to the charitable institutions.
I am advised that the cost of purchasing annuities would be approximately $136,000 and that the present value to the annuitants of their separate annuities is $98,002.11.
The decree will be that the assets in the hands of the executors for the purpose of paying annuities be reinforced by the refund to them by the six charities of $10,000 each and the assignment to the executors of the $150,000 mortgage, and if that be insufficient for the purpose, a further application may be made for a refund, pro rata, among the ten individual legatees. *Page 516 
The ultimate legatees who will be decreed to refund to the executors raise the jurisdictional question as to whether this court may make the decree above outlined, in the absence of one of the ten individual legatees. The fact is that this one legatee was not served with process or notice of the suit, his present whereabouts being unknown and notices mailed to his last known post office address being returned. It will be noticed that his rights are in nowise affected by the present decree and will not be affected unless and until he, as one of the ten individual legatees, be decreed to make a refund, and when that time comes, if it does come, I have no doubt that the court will have jurisdiction to proceed and determine the controversy as between the parties then before it.