ISAAC OWEN, JR., et al., complainants-appellants,

v.

JOSHUA P. OWEN et al., defendants-respondents.

[Decided October 12th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion: .

There are several grounds upon which a court of equity is justified in setting aside a transaction of this kind, if the evidence warrants the charges which are made. A sale at a price grossly inadequate will be set aside by a court of equity. The testimony in this case, however, does not support the claim that the property was sold at a grossly inadequate price. The mere fact that it may have been sold for less than it was probably worth will not justify a decree setting aside the sale. To justify such a decree the proofs must establish as a fact that it was sold at a grossly inadequate price, and a grossly inadequate price has been variously defined by the courts. Perhaps the most popular definition is a price so inadequate as to shock the conscience of the court. That, of course, is a figurative expression of a standard which conveys no very definite idea in percentages.

At one time I had occasion to determine for my own benefit about what percentage of value was regarded as a grossly inadequate price by examination of the various authorities where sales had been set aside by the courts upon that ground and where they had not been, and I examined what I think was every New Jersey decision upon the subject and ascertained from the cases just what the figures were which were involved in the proofs, and I found, taking all the cases together and adopting that method with a view of ascertaining a possible basis of mathematical standard, that anything in excess of fifty per cent. of the real value had not been ordinarily regarded by the courts as a

grossly inadequate amount. I do not mean to say by that that cases cannot be found in this state where sales were set aside upon the ground of grossly inadequate price where the selling price had been more than fifty per cent. of the value, for some cases involve other circumstances more or less patent when considered in connection with the selling price, but an examination of all the authorities will lead, I am quite convinced, to the conclusion that the selling price must not much exceed fifty per cent. of the value if that branch of the court's jurisdiction is to be invoked solely on that ground.

It necessarily follows that the values testified to in this case would not justify a decree setting aside the sale on the sole claim of gross inadequacy. In fact, the testimony of the real estate agents and others who have placed valuations upon this property varies little more than they usually do in cases of this kind. I find that there are two classes of real estate experts, and in most every transaction that is investigated they will be found dividing themselves up into one or the other of the two groups, one being the group of low valuations and the other of high. I think counsel now before me have no doubt been engaged in many cases where it was necessary to have values placed upon land by a great number of real estate agents on either side, such as condemnation suits, and cases of that nature, and my observation has been, and I doubt not that counsel's observations have been, that almost invariably the witnesses will line themselves up into the high and the low cases, respectively. Juries sometimes take the total and divide it by two, and I am not sure that they do not get pretty nearly the right result by that method, and I apprehend if we take the maximum valuation here of $2,500, and the minimum of $1,575, add them together and divide them by two, we will not get far from the value of this property at the time it was sold.

But, in any event, the proofs do not clearly enough disclose any gross inadequacy of price to justify the exercise of the jurisdiction of this court to set aside these sales upon that single ground.

Another ground upon which a sale of this kind might be set aside would be an inadequate advertisement or any other proceed-

ing that was had preliminarily to the sale which was calculated to violate the essential principles that properly enter into a public sale—proceedings that were calculated to or that did in fact result in a sale which was unfair—a sale which had not been advertised in such manner as to meet the inherent requirements of the law which contemplate that all public sales of this nature shall be advertised in such manner as will properly exhaust the field of bidders which can be reasonably procured by a proper advertisement. I think, however, that the proofs fail in that respect. It might in this case have been advantageous to have included in this advertisement the circumstance of the existence of a house on the lot to be sold, or that this property was suitable for residential purposes, that it contained a building that could be used as a residence and therefore was not the sale of a vacant property which could only be purchased to advantage for purpose of speculation or anticipated building; but it is impossible to say that the elimination of that element in the advertisement was operative to lead to an unfair sale. I cannot believe that the rights of a *bona fide* purchaser at such a sale could be disturbed, after a purchase had been made by such a purchaser, by reason of the omission in the notice of sale of that valuable element touching the nature of the property to be sold.

The next question, and I think the more serious question, is the one that takes into account both of the elements which have been already suggested, namely, the claim that this property was not purchased in good faith by the person in whose name the title was taken, but that it was in fact purchased in the interest of the executor. The fact that the advertisement did not specify clearly the inherent quality of the property is referred to as a circumstance showing a desire to have the property sold at an inadequate price, or, at least, sold cheaply in the hope that it could be acquired in the interest of the executor, or in the interest of the executor's family. The circumstance that it did sell at a low price can also be considered in ascertaining, if possible, whether this was a *bona fide* sale to the person who made the purchase. But the more imposing and the more vital elements of the testimony upon that subject is the additional circumstance, which is, to say the least, a curious circumstance, that the son of the

executor should buy this property with no present means of paying even the usual and customary ten per cent. that is required in cases of purchases of this kind. It is, unquestionably, true that what transpired suggests, and reasonably suggests, the gravest doubts as to whether this property was not in fact purchased in a manner essentially different from the way claimed by defendants. The circumstance that this son instead of bidding for himself sent someone to bid for him, and entrusted his agent to exercise his judgment, without specific instructions, to such an extent that he was compelled to segregate the values of the homestead property and of the vacant lots in the rear in such manner that the total purchase should come within the limit which had been given him, if, indeed, a limit was given him, and of that there seems to be some doubt, is extraordinary. In other words, if the limit of $2,000 had been given to this purchasing agent, how could he tell in paying $1,575 for the homestead property that he would be able to purchase the other two lots, separately sold, which lots appropriately went with the property for the remaining portion of the $2,000? It appears he did do so. It came out that way, but it is a peculiar and unusual and difficult position to place a friend in who is to go to a sale to accommodate a purchaser.

But the more extraordinary feature of the transaction as it impresses my mind is that the son would send a man on an errand of that kind without money, without a deposit, without any really definite instructions and without money or substantial credit of his own. Those are suspicious circumstances that cannot help but more or less stagger the mind and invite doubts, but they are not conclusive. While I confess I have doubts on the subject, I am obliged to say that I do not feel privileged to conclude that these three men have deliberately perjured themselves upon the subject. This purchasing agent, Mr. Jones, has positively sworn, and with apparent truthfulness, to his part of the transaction. It would be going far to conclude that he has deliberately sworn falsely when corroborated by the executor and the executor's son. The son has told the same story, essentially the same, and though I confess the story is a strange one, I am unable to believe that I can be justified in disregarding it. The

father, who is the executor, swears that he knew nothing about the intention of the son to buy this property and did not know that it was being bought in his son's behalf. The peculiar and remarkable circumstance of the son relying upon his father to assist him to finance this transaction is not altogether impossible in its conception, because with a father able to do so, and with the relations of the father and son of such a nature that the son could well rely on the father, it is not impossible that he might have realized that he could buy this property and depend upon his father, who was the executor, to help him finance it. If that is so, and this purchase was in no sense in the interest of the father, and they both swear positively that it was not, the circumstance that he did help him finance it afterwards cannot be regarded as operative to set aside the sale.

If the transaction was a *bona fide* one throughout, from beginning to end, there is no reason why the father should not advance the necessary money to help the son through in this purchase, and I am compelled to conclude that that was the situation.

The son wanted the property for sentimental reasons, and had good reason to believe that his father would help him out in the purchase, and therefore bought the property on his own account. That is the conclusion that I am obliged to reach under the recognized methods of reaching conclusions that are essential and necessary in cases of this kind. The suspicious circumstances to which I refer are not, in my judgment, adequate to justify the court in disregarding the testimony of these men who appear to tell the truth and who I am compelled to believe.

I will therefore be obliged to advise a decree dismissing the bill.

*Mr. Albert R. McAllister,* for the appellants.

*Mr. Royal P. Tuller* and *Mr. Martin W. Lane,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Leaming.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, ·SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—14.

*For reversal*—None.