James R. Pettigrew died on October 18th, 1928, leaving a last will and testament which was duly admitted to probate by the surrogate of Bergen county on October 30th, 1928; who thereupon issued letters testamentary to Harry R. Gabay and the Citizens Trust Company, of Paterson, New Jersey, the executors therein named. Under its provisions, the testator made specific disposition of legacies amounting to $148,500, included amongst which were $35,000 each, to Robert H. Pettigrew and Harry R. Gabay, $33,500 apportioned amongst several distant relatives and friends, and $45,000 to Minnie H. Van Ness, between whom and the said Harry R. Gabay, the residue of the estate was to be equally divided. *Page 402 
On March 26th, 1932, the executors exhibited and filed for settlement and allowance, their intermediate account in the orphans court of Bergen county. To this account exceptions were duly filed by Robert H. Pettigrew, one of the legatees under the said will, who, at the same time filed a petition seeking the revocation of the letters testamentary granted to, as well as the removal of, the said executors.
After hearing considerable testimony, adduced both on behalf of the exceptant and the executors, that court, by two separate orders entered on March 28th, 1933, disallowed all of the execeptions, allowed the account as filed and dismissed the petition for the removal of the executors. It is the legality and propriety of these orders that the exceptant, by his present appeal to this court, in which he is joined by Minnie Van Ness, another of the legatees under the said will, seeks to have reviewed.
The exceptions as filed and disallowed may, for convenience, be grouped under three separate heads as being those with respect to (1) moneys disbursed by the executors; (2) the prices realized by the executors from the sale of certain stocks and bonds; (3) the failure by the executors to sell certain securities and the real property owned by the estate.
As to the first of these groups, appellant's contentions may be summarized as being; that there was no need of any telephone service and that the payments to the telephone company therefor were unwarranted and illegal; that the services of Joseph Nosel were not necessary to the due administration of the estate, and that, therefore, all wages paid to him, part of which was the payments to Jane Adams for his board, were excessive, unwarranted and illegal; that the payments made to Robert Clement, the inheritance tax commissioner of Topeka, Kansas, Robert H. Woodward, tax collector, and to the township of Saddle River were excessive, improper and illegal.
An examination of the evidence, however, discloses that Joseph Nosel, during the testator's lifetime and at the time of his death, had been regularly employed by the testator as a caretaker of his property, receiving as compensation therefor, *Page 403 
besides his board which was furnished by Jane Adams and paid for by the testator, the sum of $75 per month. The executors, after qualifying, merely continued his said employment on the same terms as were in effect at the time of the testator's death. The services rendered by him were both extensive and varied in character, consisting of properly maintaining the farm, and the buildings thereon, and also caring for and looking after the live stock. These duties, however, were somewhat lessened in 1930 when the live stock was sold by the executors, whereupon they reduced his wages to $50 per month, for which he continued to work until a tenant was procured for the entire farm, immediately upon which his services were dispensed with and his wages ceased. Considering the nature, character and extent of these services, I am constrained to find that they were necessary for the due preservation of the property and that the compensation paid therefor was neither excessive, unwarranted nor illegal.
The maintenance of the telephone service in the testator's property entailed but a small expense and was necessary as affording an expeditious means of enabling the executors and caretaker of keeping in prompt contact with each other which, of course, was conducive to a more efficient and expeditious discharge of their respective duties, without the loss of time and expense incidental to personal visitations or correspondence by mail.
In order to sell a lot of pieces of old furniture and household articles at the best prices obtainable, the executors engaged the services of Robert Clement, a licensed and experienced auctioneer. A mere consideration of the prices which each of these articles brought at the public auction sale conducted by him will demonstrate beyond any peradventure the executors' wisdom and foresight in enlisting his services. Although all of these articles had been duly appraised at the sum of $252.50, they netted the estate, as a result of his services, the sum of $1,816.97, from which the executors paid him for all of his expenses, advertising and services the sum of $378.06. In the face of such accomplishment and results, it may well and truly be said that he was worthy of his hire. *Page 404 
Nor do I find any substance or merit in the appellant's contention that the payment to the inheritance tax commissioner of Topeka, Kansas, was unwarranted or unjustified or that the executors should be surcharged with the amount of the interest which they had paid on the taxes to Robert H. Woodward and the township of Saddle River.
In order to legally effect the transfer of some stock which the testator, at the time of his death, held in some Kansas corporations, the executors were compelled by force of a statute of that state then in effect to pay an inheritance tax to that state on the stock in question. While it is true that the United States supreme court in First National Bank of Boston v.Maine, 284 U.S. 312, has held that a state cannot legally impose a tax upon a transfer, occasioned by death, of shares of stock in a corporation created under its laws which constitute a part of a non-resident decedent's estate, nevertheless it is also true that the cited case was not decided until January 4th, 1932, which was more than two years after the payment of the tax in question.
At the time of paying the inheritance tax in question, the executors were faced with the duty of paying it or incurring the statutory penalty prescribed for failing to do so. They decided to and did pay the tax, amounting to $66.71, which to them at the time undoubtedly seemed to be the best course to pursue. Their doing so was undoubtedly motivated by a desire to maintain the marketability of this stock free from any legal barriers or obstacles that might otherwise have arisen and interfered with the sale thereof, which in turn may have resulted in a loss to the estate owing to shrinkage in value of said stock. The executors were not under a legal duty to decide with faultless judgment and legal nicety the legality or constitutionality of the Kansas statute in question before paying the tax under it. They were only required to act in good faith and as the average person of ordinary prudence and caution would under like circumstances have done, which the evidence clearly shows they did.
The case is devoid of any evidence tending to show or establish that the executors had sufficient funds in hand *Page 405 
wherewith to pay the taxes and assessments which had been levied against the property by the township of Saddle River or the other municipality at any time before their actual payment. Being without the necessary funds, it is self evident that the executors could not have paid them before they did. It would be a most unique and unjust situation indeed if they were to be penalized for not having done that which it admittedly was impossible for them to have done. Yet, that is exactly what the inevitable result would be if they were to be surcharged with the interest which they were compelled to pay on these taxes and assessments. The cases of In re Walter, 37 N.J. Law 233; Tucker
v. Tucker, 33 N.J. Eq. 235; Wyckoff v. O'Neill, 71 N.J. Eq. 729,
and In re Slater, 88 N.J. Eq. 296, cited by appellants in support of their contentions to the contrary are not in point because there, as is not the fact here, the executors were shown to have had sufficient funds wherewith they could have paid the taxes before the accrual of any interest thereon.
Passing now to a consideration of the second group of exceptions, in connection with which it is insisted by appellants that the executors sold the securities in question at too low a price and that they, therefore, should be surcharged, appellants, however, failed to adduce any evidence which established or from which it could be reasonably inferred that the sale of these securities was the result of a lack of good faith or any failure on the part of the executors to exercise ordinary diligence, prudence or caution. On the contrary, appellants themselves conceded that the quotations on these securities greatly fluctuated after the 1929 stock market crash and that in February, 1931, when they were sold, the market had made a partial recovery, yielding the enhanced price at which the executors then sold.
With respect to the third of these groups of exceptions, it is the appellant's contention that the executors have negligently and wastefully retained as part of the testator's estate certain securities as well as the real property of the estate.
These securities, as all such others, were neither immune nor escaped from the financial cataclysm which unheralded *Page 406 
and with such rapidity and devastating effects engulfed the stock market in 1929, that the vast fortunes of even some of our ablest financiers were completely swept away. For the precipitous decline in the market and the general economic depression which followed, the executors cannot be held to account. To have sold the securities under such conditions — and at a time when even financial geniuses were literally pouring their fortunes into the stock market coffers so that they might be able to hold rather than sacrifice their securities — would probably have rendered the executors surchargeable for what then to most all hopefully appeared to be but temporary and retrievable abnormal shrinkages in values.
In not then selling, they merely did as hundreds of thousands of other ordinarily prudent and cautious persons. To surcharge them for so acting would be to exact of them the exercise of a far greater degree of care, caution and foresight than would have been exercised by the ordinarily average prudent and cautious person under similar circumstances, which, of course, the law does not require of them. Heisler v. Sharp's Executors,44 N.J. Eq. 167; Beam v. Paterson Safe Deposit and Trust Co.,83 N.J. Eq. 628; Smith v. Jones, 89 N.J. Eq. 502; In re Leonard,107 N.J. Eq. 235; In re Nice, 109 N.J. Eq. 169.
The appellant asks that the executors be surcharged to the extent of the shrinkage in the value of the estate's real property. Such a request, in view of the evidence before me, must, of necessity, find its existence in the supposition that they were legally enjoined to sell at the moment when the real estate had attained its highest possible price. Were such the legal requirement — and it is not — then none but prophets or sages would dare or be able to qualify as an executor, because he, by some superhuman, mystic or magical process, would be required by law to ascertain exactly when the property value would attain a point from which there would be no further advance and at the same time discover a person then ready, willing and able to buy at that price.
Appellants complain that the executors' asking price for the real estate was $2,750 per acre. They lose sight of the fact, *Page 407 
however, that this price was based upon the appraised value of the property as made by Messrs. Easton and Cook, realtors of unquestioned qualifications and long experience with respect to values of Bergen county property of similar types, whom the executors had engaged for said purpose.
Although appellants now complain about the executors' failure to sell the real property, it is significant, however, that they failed to show that there ever was a time when the executors could have sold the property at a fair price or that it could be sold at all excepting at a price far below its then fair market value.
The unquestioned evidence clearly establishes that the executors, through Mr. Van Auken, their proctor, consulted various realtors, contracted with several real estate firms, brokers and persons likely to be interested in this property in their attempt to sell the property, but without avail. In but one instance were they offered what then appeared to be a fair price for the property. That offer, however, was conditioned upon the executors procuring a permit for the prospective purchaser enabling him to use the property for cemetery purposes, a condition which was then impossible of fulfillment.
The only legitimate inquiry here to be made is did the executors act in good faith and as the ordinarily prudent and cautious person would have under similar circumstances. If they didn't, then their motives or virtues, although they may have been intended to subserve the best interests of their trust, cannot exonerate them from liability for the consequences. If, however, they did, then the mere fact that they were mistaken or erred in the exercise of their honest judgment cannot be invoked or relied upon for the purpose of subjecting them to liability for any resultant loss.
The evidence impels me to the conclusion that the executors, throughout the administration of their trust, acted in absolute good faith, within the scope of their power and as the ordinarily prudent and cautious person would have under similar circumstances. The orders appealed from will be affirmed. *Page 408