The bill in this cause seeks to set aside a sale of one hundred and forty (140) shares of the capital stock of Hatch Land Improvement Company made by Hazel H. Forsyth and Albert C. Middleton, executors under the will of *Page 46 
Joseph H. Forsyth, deceased, because it is alleged that the amount realized from the sale was grossly inadequate and that the sale is a fraud on the complainants who are residuary legatees under the will of the testator; the bill also seeks the removal of Hazel H. Forsyth and Albert C. Middleton as executors and trustees, and an accounting by said executors, in the event that the sale is not set aside, for the losses incurred by said estate by reason of the sale of said stock, and a decree ordering said executors to pay to said estate such amount as may be found due and owing upon such accounting.
Joseph H. Forsyth died November 7th, 1928, leaving his last will dated December 24th, 1925; by a codicil thereto he appointed his wife, Hazel H. Forsyth, and Albert C. Middleton executors and trustees. The will was duly admitted to probate by the surrogate of Camden county on November 19th, 1928. In said will he first directed the payment of his debts and funeral expenses and then provided:
"All the rest, residue and remainder of my estate, real, personal and mixed, wheresoever the same may be situate, I give, devise and bequeath unto my Executors and Trustees hereinafter named, to invest, re-invest and keep invested, to the best of their judgment and to pay the income therefrom as follows:
"1. After deducting all just expenses the whole income of my estate shall be payable to my widow, Hazel H. Forsyth, for and during the term of her natural life or as long as she remains my widow."
After the death or marriage of his said wife, he ordered and directed that the principal of his estate should be divided by the payment of general legacies in the amounts therein stated to eight nieces and nephews, and general legacies to the trustees of Cooper Hospital of Camden and the creation of a fund to be known as the "Hatch Memorial Fund" for investment, the income to be used for charitable purposes as therein provided, and finally directed that any residuary of his estate then remaining should be divided among the beneficiaries excepting the trustees of said memorial fund, and further directed that in the event of the death of the beneficiaries before receiving their share, their issue should be entitled to such share. *Page 47 
Included in the inventory and appraisement of the estate amounting to $1,363,295 filed on August 8th, 1929, there appeared among the assets one hundred and forty (140) shares of stock of Hatch Land Improvement Company which were appraised at $2,334 per share, aggregating $326,760. While the executors of Senator Forsyth's estate had filed an intermediate account, no final account has been filed. From the decree of the orphans court allowing the intermediate account of the executors, an appeal was taken to the prerogative court, which appeal came before me sitting as vice-ordinary. Before I had passed upon the merits of that appeal, the appellants and respondents presented to me a decree to which the proctors had consented. Such decree was dated February 24th, 1936, and disposed of such appeal. In the decree, a copy of which was in evidence in this cause, an adjustment of commissions was made in which the commissions were fixed at four per cent. on seven hundred thousand dollars ($700,000), apparently indicating a depreciation in the appraised value of the estate of several hundred thousand dollars.
The assets of the Hatch Land Improvement Company, of which Senator Forsyth was president at the time of his death and owner of the one hundred and forty shares of the capital stock, constituting two-thirds of the total thereof of two hundred and ten shares, were made up principally of real estate. At the time of the sale of these shares of stock held by the estate to the defendant F. Harvey Tripp, the assets of the company consisted of approximately $4,575 in cash, $42,000 of securities; mortgages of the face value of $26,700; and improved and unimproved real estate estimated to be worth between $175,000 and $237,000, according to the values fixed by real estate experts who testified at the hearing.
All of the stock in the Hatch Land Improvement Company was held by members of the Hatch family. Senator Forsyth inherited his stock from his mother, and the officers of the company at the time of his death were members of the Hatch family. After Senator Forsyth's death, Isaiah Hatch, who *Page 48 
died prior to the transaction in question, became president of the company; H. Morgan Hatch was secretary, and Hazel H. Forsyth became treasurer. After the death of Isaiah Hatch, H. Morgan Hatch became president and Mrs. Forsyth remained as treasurer.
About the time of the death of Senator Forsyth, the real estate boom in Camden county, brought about by the speculation attending the building and completion of the Delaware river bridge and by other conditions attending the general wave of speculative buying of real estate, had begun to subside; the subsidence continued, thereby lessening rapidly the marketability of real estate and the marketability and value of mortgages, and progressed with the long depression which followed the break in the stock market in 1929. The Hatch Land Improvement Company sustained losses, ceased to pay dividends, and was required to take over, through foreclosure or otherwise, many properties upon which they had held mortgages; and at the time the stock of the Forsyth estate was sold, the company owed delinquent taxes aggregating $34,000, besides interest. The stock was unlisted and there appeared to be no market for it; while the real estate owned by the company had a market value in the opinion of the real estate experts who testified, yet there seemed to be no purchasers. Beginning with 1930, each year showed the company sustaining losses which greatly increased until in 1935 the loss was $6,758.01. The market for real estate was such that there appeared to be no prospect of improving the salability of the stock in this company. The executors had Mr. Ralph D. Baker, a well known real estate expert and analyst, make an appraisement of the real estate and mortgages of the company; this appraisement, which is one of the exhibits in this cause, was transmitted to the executors by letter under date of June 10th, 1936, and showed the appraised value to be $207,015.99. At the hearing Abraham Rosenfeld and George B. Robeson, two other well known real estate experts, testified on behalf of the complainants; they appraised the real estate and mortgages at approximately $237,000. J. William *Page 49 
Markeim, another well known real estate expert, who, in addition, practiced accounting, giving particular attention to the matter of the value of stock in real estate companies of similar nature to the Hatch Land Improvement Company, testified on behalf of the defendants. He had had the benefit of the testimony of the Messrs. Rosenfeld and Robeson and had examined carefully the appraisal made by Mr. Baker and was well acquainted with the real estate and holdings of the Hatch Company. He accepted the Baker appraisal generally, but, because of his particular experience with a property located at Delair in Pennsauken township, Camden county, New Jersey, his appraisement was somewhat less than the Baker appraisement and the appraisement made by Messrs. Rosenfeld and Robeson. Mr. Markeim testified that after taking into account the net assets over liabilities of the Hatch Land Improvement Company, the book value of the stock of the company was $848 per share; he also testified that in his opinion the market value of the stock in this company was below the book value to which he had testified, and that "when a corporation, that is, a real estate holding company, loses, and the losses continually increase, it forms a tendency to keep increasing because of increasing taxation, and where the burden of taxation is supposed to be met by all the people, and then some, through some inability, can't pay, it is thrown on the real estate that can pay, and your tax rate goes up, they don't collect sufficient taxes to meet the budget, and you go back to the problem of the real estate holding company assuming losses in the form of taxation, or the lack of receiving income on assets which taxes are predicated on, real estate holdings."
The sale of the stock in question took place after some conferences participated in by the executors and the defendant F. Harvey Tripp, the purchaser of the stock, which resulted in an offer to the executors made in writing, which offer was delivered to Miss Anna Peterson who acted as secretary for the executors of the Forsyth estate. His letter is as follows: *Page 50 
 "F. HARVEY TRIPP 1500 Walnut Street Philadelphia
 West Jersey Trust Bldg. Camden, N.J. July 24, 1936.
Mrs. Hazel H. Forsyth, and Hon. Albert C. Middleton, Executors and Trustees Estate of Joseph H. Forsyth, Deceased.
Dear Executors:
Following recent conferences regarding the 140 Shares of HATCH LAND IMPROVEMENT COMPANY stock which you have for sale, the following offer is hereby made:
(1) I will purchase said 140 shares of stock at $400 per share, total $56,000 payable in cash at the time of delivery.
(2) A certified check for $5,000 is attached hereto as a part of total purchase price of said 140 shares of stock in the event that the terms are accepted. If offer is refused, said certified check is to be returned to me.
(3) Upon acceptance of offer and delivery of said stock to me, I will deliver in writing within one month to each stockholder of record, an offer to purchase their stock upon the same terms as offered you with the exception that I will demand 90 days in which to make final settlement with said minority stockholders.
(4) This offer is null and void unless accepted before noon on Friday, July 31, 1936.
 Respectfully submitted, F. HARVEY TRIPP."
At the time of the receipt of this offer to purchase stock, Mr. Middleton, one of the executors, was at Seaside Park, New Jersey, and Mrs. Forsyth, the other executor, was in Massachusetts. Miss Peterson consulted Thomas E. French, Esq., of the firm of French, Richards Bradley, who represented the executors in matters connected with the estate. Mr. French then prepared a receipt and acceptance, afterward executed, which is in evidence and reads as follows:
"Received from F. Harvey Tripp Five Thousand Dollars deposit on sale of 140 shares of the capital stock of Hatch Land and Improvement Company at $400 per share in cash, the balance $51,000 to be paid in cash on or before July 31, 1936, upon delivery of the certificate of stock. If for any reason the stock cannot be delivered the deposit to be returned.
 July 27, 1936. HAZEL H. FORSYTH ALBERT C. MIDDLETON Executors of Joseph H. Forsyth, Deceased. *Page 51 
I agree to purchase from the executors of Joseph H. Forsyth, Deceased, 140 shares of the capital stock of the Hatch Land and Improvement Company upon the terms set forth in the above receipt.
July 27, 1936. F. HARVEY TRIPP."
and directed to Miss Peterson a letter concerning the matter which is as follows:
"July 27, 1936.
Forsyth Estate
Miss Anna L. Peterson, 510 West Jersey Trust Bldg., Camden, New Jersey.
Dear Miss Peterson: —
We had an interview with Mr. F. Harvey Tripp this morning in reference to his proposed purchase of 140 shares of Hatch Land 
Improvement Co. for $56,000 cash. We understand that the executors are willing to sell at that figure and do not believe they could get anything near that sum at a public sale. In our opinion the executors have the power to make the sale and if in their judgment that is the best price they can obtain on the stock, they should make the sale.
As the matter had to be closed by July 31st we prepared the receipt for the deposit of $5,000 and the agreement to purchase and handed them with the certified check to you.
In view of the fact that Mr. Fennell, the Washington attorney, for the remainder interest, had claimed the stock had little value, we determined it was not necessary to notify him.
Very truly yours, FRENCH, RICHARDS BRADLEY By THOMAS E. FRENCH. TEF/N"
Miss Peterson then took these papers to Mr. Middleton, one of the executors, at Seaside Park where he signed the receipt. She then went to Massachusetts and saw Mrs. Forsyth who also signed the receipt, and the transaction was closed by the signing of the acceptance by Mr. Tripp. The final settlement for the stock took place on July 31st, 1936, at which time the necessary transfers were executed and the balance of $51,000 of consideration was paid in cash or certified check. Mr. Tripp afterward purchased the remaining stock of the corporation from the individual stockholders at the same price per share.
The bill in this cause was filed on December 14th, 1936, although it is alleged therein that the complainants had *Page 52 
learned of the sale of the stock on August 15th, 1936. It is further alleged in the bill that H. Morgan Hatch, president of the Hatch Land Improvement Company at the time of the sale of the stock to Mr. Tripp, had offered to buy the same for the sum of $81,000, a sum in excess of that paid by Mr. Tripp. Annexed to the bill is a copy of interrogatories and answers in connection with a bill in chancery filed by Frank F. Willson et al., complainants, against H. Morgan Hatch, defendant, although no reference to these interrogatories is made in the bill filed herein. The negotiations which took place between H. Morgan Hatch and Mrs. Forsyth, one of the executors, concerning his alleged offer to purchase the stock for $81,000, were informal and consisted largely of discussion, in which, according to the testimony of Mr. Hatch, he offered his promissory note with which was to be pledged as collateral the stock then owned by the estate, as well as the stock which he already owned; after consultation by Mrs. Forsyth with her counsel, Mr. French, the offer was rejected.
Mr. Hatch testified that Mrs. Forsyth told him that she would do nothing with the stock until sometime in September when she returned from her vacation; but this statement was denied by her. I am inclined to think that Mr. Hatch never contemplated any plan for obtaining a transfer to him of the stock which required the payment of any substantial amount of money in cash; and I feel sure that it was so understood by the executors. It did appear that Mr. Hatch had talked this matter over with Mr. French representing the estate, and had been advised that the executors would not be justified in selling the stock except for cash, unless the residuary legatees should consent thereto.
I do not think that such offer as was made by Mr. Hatch, and rejected by the executors, could in any way be considered as fixing a market value upon the stock. Mr. Hatch himself, while president of the company, and a short time prior to the sale of the stock to Mr. Tripp, had attempted to buy seventeen shares of stock which had been pledged to the First Camden National Bank as collateral security. At that time he offered $500 for the entire block of seventeen shares; the bank *Page 53 
countered with an offer to sell the stock for $500, that is, $500 per share. After the closing of the sale of the stock by the executors to Mr. Tripp, the bank sold these seventeen shares to Mr. Tripp for $400 per share.
Complainants have endeavored to show by the testimony, particularly that of Mr. Hatch, a lack of good faith on the part of the executors in the sale of this stock to Mr. Tripp. However, in view of all the circumstances, the condition of the company, its increasing losses and increasing load of delinquent taxes, the uncertainty of future events affecting the value and salability of the stock, I have concluded that there was no lack of good faith upon the part of the executors nor failure to do what they considered in accordance with their best judgment to be for the best interests of the estate.
It appeared in the case that the brother of Albert C. Middleton, one of the executors, had introduced Mr. Tripp to Mr. Middleton and that thereafter the negotiations concerning the sale were carried on by the executors with Mr. Tripp. The fact that Mrs. Forsyth, one of the executors, paid Mr. Frank B. Middleton, Jr., the brother of her co-executor, the sum of $1,500 out of the proceeds of the sale of stock for his services as a broker in connection therewith is urged by the complainants as an additional evidence of a lack of good faith. I am not called upon to pass upon the propriety of this payment, and will leave the matter to the orphans court to determine when another account is filed. I do not see, however, that it in any way affects the question of the good faith of the executors in the transaction.
Counsel for the complainants also contend because Mr. Albert C. Middleton, the co-executor, did not testify at the hearing that his failure so to do displays his lack of good faith in the matter. However, he was under subpoena by the complainants and was in court on September 15th and 16th, 1937, the first two days of the hearing, but was not called upon to testify. When the hearing was continued to October 4th, Mr. Middleton was ill and did not appear in court, and it was then that counsel for the complainants stated that he was subpoenaed on behalf of the complainants in order to *Page 54 
produce certain papers. Rather than have the case continued to a later date, counsel for the defendants decided to forego Mr. Middleton's testimony under the circumstances, and I do not feel warranted in drawing any unfavorable inference from his failure to testify.
An effort has been made to attach some significance to the fact that Mr. Tripp, the purchaser of the stock, repaid to Mrs. Forsyth in September of 1936 the sum of $160 representing one-half of the bill of $320 rendered by Mr. Baker for his services in making his appraisal. This appraisal was not made for the benefit of Mr. Tripp, but, as stated by Mrs. Forsyth, for the benefit of the estate. After the whole transaction was closed up, however, and the estate had no further need for the appraisal, she concluded it would be good business to realize half of the amount paid for it through the sale of it to Mr. Tripp.
It has also been argued on behalf of the complainants that Mr. Tripp might have had an opportunity to see the Baker appraisal before he made his offer to purchase the Hatch Land Improvement Company stock, and might thus have improperly obtained information concerning the affairs of that company, by reason of the fact that in May the officers of the latter company had a safe and desk room in Mr. Tripp's office and also by reason of the fact that a Miss Allen was employed by both Mr. Tripp and the Forsyth estate as bookkeeper. However, the testimony shows that Mr. Tripp had had no access to papers belonging to the company, and it seems to me that there is nothing in the evidence which indicates anything but a bona fide transaction between Mr. Tripp and the Forsyth estate for the purchase of the stock.
The executors concluded that the offer of $56,000 in cash made by Mr. Tripp for the stock should be accepted under all of the circumstances, and that in their best judgment the proposed sale would serve the best interests of the estate. I cannot reach the conclusion from the evidence that the amount realized from the sale of the stock was grossly inadequate nor that the sale worked any fraud on the complainants. The executors acted upon the advice of their counsel, Mr. *Page 55 
French, a lawyer of the highest standing and a man of wide experience in matters concerning the settlement of estates and the duties of executors. Mr. French, who became a member of the bar of New Jersey in 1876 and continued to practice in Camden up until the time of his death a few months ago, testified at the hearing concerning this matter, and I believe from his testimony and the letter which he wrote to the executors that he felt that this transaction was for the best interests of the estate under the circumstances; otherwise, he would have so advised the executors.
In the case of Owen v. Owen, 88 N.J. Eq. 353, the court of errors and appeals affirmed a decree advised by Vice-Chancellor Leaming for the reasons stated in his opinion filed in this court. In that case the testimony was that real estate sold at public sale for $1,575 had a market value of $2,500; the bill sought to set aside the sale for inadequacy in price and also attacked the good faith of the transaction. In that opinion Vice-Chancellor Leaming said:
"There are several grounds upon which a court of equity is justified in setting aside a transaction of this kind, if the evidence warrants the charges which are made. A sale at a price grossly inadequate will be set aside by a court of equity. The testimony in this case, however, does not support the claim that the property was sold at a grossly inadequate price. The mere fact that it may have been sold for less than it was probably worth will not justify a decree setting aside the sale. To justify such a decree the proofs must establish as a fact that it was sold at a grossly inadequate price, and a grossly inadequate price has been variously defined by the courts. Perhaps the most popular definition is a price so inadequate as to shock the conscience of the court. That, of course, is a figurative expression of a standard which conveys no very definite idea in percentages."
I have already discussed the lack of adequate proof to overcome the difficulty of establishing what could be considered to be a market price for the stock in question, and no sufficient evidence was produced to show that there was any market for the stock or that any offer therefor had been submitted *Page 56 
in cash for more than $56,000, the price for which it was sold to Mr. Tripp. The First Camden National Bank, after some investigation, had offered to sell seventeen shares to Mr. H. Morgan Hatch for $500 a share in response to his offer of $500 for the entire block of seventeen shares; and after the Forsyth stock had been transferred to Mr. Tripp, the holders of the remaining shares in the company had sold their stock for $400 a share, from which I think that it can be properly concluded that the price obtained was not so inadequate as to shock the conscience of the court.
A fundamental principle of law, well established in this state, is that where an executor acts in good faith and with ordinary discretion, and within the scope of his powers, his acts cannot be successfully assailed. He may do anything within the scope of his powers without risk of personal liability for the consequences of his acts, provided he exercises the care and judgment of a man of ordinary prudence and sagacity. Heisler v.Sharp's Ex'rs, 44 N.J. Eq. 167; affirmed by the court of errors and appeals, 45 N.J. Eq. 367, for the reasons stated in that case by the ordinary.
In the case In re Corn Exchange National Bank, 109 N.J. Eq. 169,
on appeal from the prerogative court, in which the latter court sustained the orphans court in surcharging an executor with a large sum of money by reason of the manner in which the executor had handled the estate, particularly with respect to the disposition of shares of stock in a company in which the testator was substantially the sole owner, Mr. Justice Parker, writing the opinion for the court of errors and appeals, said:
"Before proceeding to the facts, it may be well to restate the principles applicable in this class of cases, as laid down by the late Vice-Chancellor and Vice-Ordinary Van Fleet, one of our ablest judges, in Heisler v. Sharp, 44 N.J. Eq. 167. In that case the executor allowed and paid a claim for services as a nurse and housekeeper, which the appellants claimed should have been repudiated and allowed to go to suit. The vice-ordinary said (at p. 172): `All that the respondents [the executors] were required to do was simply *Page 57 
to do what any man of ordinary prudence and caution would, under the circumstances, have done. So long as the executor acts in good faith, with ordinary discretion and within the scope of his powers, his acts cannot be successfully assailed. No man is infallible, the wisest make mistakes, that no man is responsible for the consequences of his mistakes which are the result of the imperfection of human judgment, and do not proceed from fraud, gross carelessness or indifference to duty.'
"This language has more than once been quoted as correctly stating the law on this point. Smith v. Jones, 89 N.J. Eq. 502
(at p. 506); In re Leonard, 107 N.J. Eq. 235, 236, 237,
the latter case being in this court. A similar rule in regard to retention by executors of investments made by the testator, has been enacted into a statute (Comp. Stat. p. 2271 pl. 34; P.L.1899 p. 236; P.L. 1881 p. 130) providing that `whenever * * * such executor * * * may, in the exercise of good faith and reasonable discretion, have continued such investment, or may hereafter continue the same, he shall not be accountable for any loss by reason of such continuance.' And in Beam v. PatersonSafe Deposit and Trust Co., 82 N.J. Eq. 518, the trustee was exempted, under the circumstances, from such surcharge by reason of holding securities on a falling market."
In the case of Harris v. Guarantee Trust Co., 115 N.J. Eq. 602;
affirmed on the opinion below, 117 N.J. Eq. 423, it was sought to hold the defendant, trustee, liable for the loss of the once market value of two hundred and nine shares of the capital stock of a company of which the testator was one of the organizers, and charge the trustee for his failure and refusal to sell the stock "when the price was high and the time was ripe." Vice-Chancellor Backes dismissed the bill, and in his opinion said:
"A trustee who, within the scope of his powers, acts in good faith, prudently, carefully, diligently, discharges the obligations of his trust; he is not responsible for errors of judgment. Heisler v. Sharp's Ex'rs, 44 N.J. Eq. 167; Beam v.Paterson Safe Deposit and Trust Co., 83 N.J. Eq. 628; In reLeonard, 107 N.J. Eq. 235; In re Corn Exchange *Page 58 National Bank, 109 N.J. Eq. 169; In re Pettigrew, 115 N.J. Eq. 401;Peoples National Bank, c., of Pemberton v. Bichler, Ibid.617."
In the last mentioned case, the question involved was the propriety of surcharging the administrator with failure to make sale of securities at an opportune time. In that case, Mr. Justice Lloyd, in his opinion written for the court of errors and appeals, says (at p. 620):
"The principal item on which the surcharge rests is the retention by the administrator of one hundred and two shares of Associated Gas and Electric Company stock appraised in the inventory at $58.25 a share and having a market value on October 1st, 1929, of sixty-seven and seven-eighths, on June 1st, 1930, of thirty-eight, and February 21st, 1930, of twenty-one. Just what its value was immediately following the disastrous break in the stock market late in October, 1929, does not appear but upon this item the accountant was surcharged in the amount of $4,768.50. We have already indicated that no charge of neglect could be laid to the door of the administrator because of failure to dispose of this class of securities prior to the break in October. There came at that time a precipitous decline in the value of all securities, good and bad. It is common knowledge, as expressed by Vice-Chancellor Lewis in In re Pettigrew, supra, that at that time `financial geniuses were literally pouring their fortunes into the coffers of the stock market so that they might be able to hold, rather than sacrifice, their securities. * * * In not then selling they [executors] merely did as other hundreds of thousands of ordinarily prudent and cautious persons. To charge them for so acting would be to exact of them the exercise of a far greater degree of care, caution and farsightedness than would have been exercised by the ordinarily average prudent and cautious person under similar circumstances.'"
In the case of In re Cross, 117 N.J. Eq. 429, on appeal from a decree of the prerogative court surcharging the executors for potential losses in the failure to sell stock held by the testator at the time of his death, Mr. Justice Case, who wrote the opinion for the court of errors and appeals reversing *Page 59 
the decree, commented upon the conditions affecting the sale of securities as follows:
"The treacherous path that lay before the investor, whether trustee or otherwise, in the spring and summer of 1931 (when it is suggested that the executors should have sold and reinvested) is apparent when, with the advantage of retrospection, we look upon the debacle that ensued. Favored forms of trust investment were sucked into the maelstrom — mortgage investments, corporate bonds, and even cash in bank. Following came the widespread apprehension of money inflation, in company with which was the doctrine, well received even in conservative circles, that participation in ownership equities was extremely desirable because of its proportionate share in the potential inflation of capital and earnings. However loudly it may now be said that people should have foreseen, most men of that degree of prudence and caution that we call ordinary did not foresee. * * *
"We find nothing in the proofs to challenge the good faith of the executors; and we do not find enough in derogation of their diligence and discretion to warrant, in our opinion, the surcharging of them for the potential losses suffered by the estate in the trying period from which we have not yet emerged."
See, also, In re Hazeltine, 119 N.J. Eq. 308, affirmed by the court of errors and appeals, 121 N.J. Eq. 49.
In accordance with the views herein expressed, I will advise a decree of dismissal. *Page 60