The bill is by a beneficiary of a testamentary trust and challenges a sale of 3,755 shares of common stock of A.D. Juilliard Company, Inc., a part of the trust estate, by the trustee to the individual defendant at what is alleged to be an inadequate and unconscionable price, and seeks to surcharge the trustee for the difference between the selling price of such stock and what is alleged to have been its value at the time of the sale, or, in the alternative, that the sale be set aside. The bill also seeks to impose liability on the purchaser of that stock on the ground that he purchased it with the knowledge that the trustee in making the sale was committing a breach of trust; the removal of the trustee for its alleged misconduct, and an accounting for profits on bank loans to the Juilliard Company while the bank-trustee was allegedly acting in a dual capacity.
The amended bill of complaint sets up four causes of action. The third, relating to failure to file an account for more than six years, was withdrawn because an account was filed during the pendency of these proceedings.
The complainant in its "first cause of action" seeks to surcharge the defendant bank and to remove it as trustee of the testamentary trust of which the complainant is a beneficiary. As stated in complainant's brief, it is based upon "allegations of an administration by the trustee antagonistic to complainant and his interest, and of the trustee's failure to exercise the good faith and business acumen required and by its general improvident administration, and in addition the sale by the trustee of a substantial part of the trust assets to defendant Westaway at a grossly inadequate and unconscionable low price over complainant's objections."
The "second cause of action" is based upon the trustee's failure to invest the proceeds of the sale of the stock in which complainant had a life interest ($356,349.50) until sometime in June, 1943, although payment therefor was received by the trustee on March 11th, 1943. It is claimed that the delay in investing these funds resulted in a loss of income to the complainant beneficiary for which the trustee is liable. *Page 168 
The "fourth cause of action" is based upon the allegation that during the trust period the trustee had made large loans to the Juilliard Company, the stock of which company constituted about 90% of the trust estate at the time of the challenged sale, thereby using its position as a stockholder to profit by its dealings with the company; and that the bank's position as a creditor of the Juilliard Company was inconsistent with that of a trustee owning a large block of stock in that company. The complainant alleges that the first loan was made on February 2d 1937, and continued until December 23d 1941; that interest collected by the bank on these loans amounted to $62,773.97; and an accounting for these profits is sought.
The charge against the defendant Westaway is that the sale of Juilliard stock by the trustee was the result of a conspiracy between the seller and the purchaser; that the sale was at an unconscionable price and constituted a breach of trust of which the defendant Westaway had notice, wherefore he is liable to complainant for the losses thus sustained.
Issue was joined on the allegations and charges in the bill of complaint, and after protracted final hearings, of which there is a voluminous record, the matter was submitted on briefs.
Chester A. Braman died November 29th, 1928, leaving a will in which he set up five trusts, one for his widow and one for each of his four children of which the complainant is one. The Central Union Trust Company of New York was named as trustee under the will and the defendant Central Hanover Bank and Trust Company is the successor of that bank by merger. For many years prior to his death the testator was president and the largest stockholder of the Juilliard Company, a Delaware corporation with main offices in New York City and which owned and operated eight textile mills in New England, New York and the South. The principal asset of each of the five testamentary trusts set up by the Braman will was 2,000 shares of the "Alwyn Corporation," a personal holding company wholly owned by the testator at the time of his death. At that time the Alwyn Corporation had assets of about $7,000,000, of which about $4,874,000 *Page 169 
was tied up in stock of the Juilliard Company, preferred stock having an inventory value of $2,954,000 and common stock valued at $1,919,000. The preferred stock was carried on the books of the Alwyn Corporation at $100 per share and the common stock at 102 1/4.
The testator's will in the eighteenth paragraph thereof, provided, in part, as follows:
"2. At the risk of my estate and without responsibility to my Executors and/or Trustee, to continue and in their discretion to turn over in the erection of the trusts herein created, any stocks, bonds or other investments in which at the time of my death any portion of my estate shall be invested, although such securities shall not be of the character authorized by law for trust investments.
"3. At the risk of the trust funds and without responsibility to my Trustee, to retain any stocks, bonds or other securities in which at the time of my death any portion of my estate shall be invested, although the same shall not be of the character authorized by law for trust investments, and likewise to have full power and authority to sell, dispose of, call in and change any and all investments * * *.
"* * * With respect to the stock of A.D. Juilliard Co., Inc., and the Alwyn Corporation, it is my wish that the same be held, unless my Executors and/or Trustee shall deem it to be for the best interest of my estate that the same, or any part thereof, be sold, or that said Alwyn Corporation be liquidated."
 FIRST CAUSE OF ACTION.
This cause of action involves two prayers for relief: first, the cancellation of the challenged sale of stock or, in the alternative, a surcharge against the trustee; and, second, the removal of the trustee. I shall first consider the prayer for surcharge or cancellation and defer consideration of the removal of the trustee until after the disposal of the other causes of action.
A.D. Juilliard Company, Inc., was capitalized at $35,000,000 on the date of its incorporation in 1921. The by-laws of the corporation contain the following provision respecting transfers of stock:
"36. Transfer of stock shall be made on the books of the corporation only by the person named in the certificate, or by attorney lawfully constituted, in writing, and upon surrender of the certificate therefor, provided, however, that no transfer of stock shall be made *Page 170 
on the books of the company, and no sales or assignment thereof shall be valid, unless such stock shall have first been offered to the corporation, and second to the stockholders of this corporation, if the corporation shall fail, neglect or refuse to purchase the same, subject to the condition that the corporation might acquire any part of said offering before any of said stock shall be offered to the stockholders."
The total outstanding stock of the Juilliard Company at the date of testator's death was 74,699 shares of preferred and 50,000 shares of common. Of the preferred stock Alwyn Corporation owned 29,548 shares; of the common stock it owned 18,776 shares. The stock of this corporation was very closely held. Counting the defendant bank as trustee of the three Braman trusts as three, and the Pomeroy family, the ultimate beneficiaries of one of the trusts which had fallen in, as one, the entire stock of the corporation was held by fourteen stockholders. It was not listed on the stock exchange nor on the curb and it had no public market.
The trustee by virtue of its ownership of the Alwyn Corporation stock, had control of about 40% of the preferred and about 37% of the common stock of the Juilliard Company at the time of testator's death. At that time the company had a surplus of $14,858,181.05. It had had substantial net earnings for the preceding five years averaging $1,214,000 per year, but from 1928 to 1942 the net earnings of the company were only $1,082,464.73. In this fifteen year period dividends on the common stock were paid only in 1929 and 1930, but dividends on the preferred stock, amounting in the aggregate to $5,572,710, or $4,490,245.27 in excess of net earnings, were regularly paid every year. In only six years of this fifteen-year period was any income applicable to the common stock earned, and two of these years, 1941 and 1942, may be considered as "war years." From 1931 to 1940, inclusive, there was a deficit for common stock of $8,017,001.89. In only two years of this period, 1933 and 1935, was any income for the common stock earned. For the five years 1936 to 1940 the income deficit was $2,165,115.26 and no income for the common stock was earned in any year during this period. At the end of 1940 the Juilliard Company surplus, largely as a result of business losses and the payment of unearned preferred *Page 171 
stock dividends, had been reduced from $14,858,181.05 to $4,804,129.52. The earnings of the Juilliard Company for the fifteen years from 1928 to 1942 showed losses in five years — 1930, 1931, 1932, 1934 and 1938 — and in four other years — 1936, 1937, 1939 and 1940 — the net profits were less than the amount required for the preferred dividends. However, in 1941 and 1942 there were substantial net earnings above the preferred stock requirements. In 1941 the company earned a net of $1,651,046.22 after preferred dividends, and in 1942 the amount was $1,786,453.44. In December, 1942, as a result of the two years of war profits, surplus had increased to $7,921,207.44. There was an average loss of $7.94 per share of common stock for the fifteen years, 1928 to 1942, or a total of $107.45 per share, notwithstanding the high earnings for 1941 and 1942. During this period the physical condition of the company's several textile plants deteriorated to a point where industrial engineers reported the necessity for the expenditure of about $5,000,000 on the four northern plants to put them in a competitive condition, and the four southern plants were reported to be equipped with obsolete machinery which would have to be replaced to put them on a post-war competitive basis.
The Alwyn Corporation was dissolved in 1942 and then the Juilliard Company stock was divided and allotted to the different trusts under the Braman will and to the trust for the complainant, Harold A. Braman, was allocated 4,357.2 shares of preferred stock and 3,755.2 shares of common stock. Prior to that time two of the trusts under the Braman will had fallen in and the assets were distributed to the remaindermen or ultimate beneficiaries. Three of the five testamentary trusts remained and in these trusts the defendant bank held, as trustee, about 28% of the outstanding common stock of Juilliard Company, and was by virtue of these combined holdings the largest single stockholder of the company.
The challenged sale of Juilliard common stock in the complainant's trust was made on March 11th, 1943, to the defendant Robert Westaway. The sale to Westaway, as consummated, included all the common stock held by the bank in the three remaining Braman trusts and comprised the sale *Page 172 
of 11,281 shares of common at $95 a share and 18 shares of preferred stock at $100 per share. The amount of cash received for the common stock was $1,071,695 and the amount received for the preferred stock was $1,821.06. Of the stock so sold, 3,755 shares of common were held in trust for the complainant and the bank received for this stock the sum of $356,349.50. In this suit, only the sale of that stock of which the complainant was the life beneficiary is challenged, the sale of the stock of the other two Braman trusts was approved by the life beneficiaries and is not involved here.
In the bill of complaint it is alleged that this common stock had a value of $250 and upwards, per share. At the final hearing complainant's expert witness placed its value at $300 per share as of the date of sale, while expert witnesses for the defendants fixed the value at from $83 to $90 per share. The testimony of these expert witnesses will be discussed later.
Only two sales of common stock of this corporation had taken place from 1926 to 1943. The first sale in 1926 was to the company by one Fred Johnson at $100 per share. It was, in effect, the cancellation of a previous stock subscription by the seller. Second, in 1938, the executors of the estate of Frederic A. Juilliard, who was president of the Juilliard Company at the time of his death, sold his stock in the company, pursuant to a provision in his will, to three persons, associates of the decedent in the Juilliard Company and of whom the defendant Westaway was one, at $50 per share. This stock was immediately resold to Juilliard McDonald, a nephew of the testator, at the same price. There is evidence indicating that this sale at $50 was influenced by estate tax considerations and a desire on the part of one of the executors to fix a low value on the stock for gift tax purposes, but the defendant bank denies this and points to the fact that under the will the executors had a right to purchase at a price to be fixed by themselves on long term credit; that a sale at less than value would have been a breach of trust as to which there is no evidence and which can not be assumed; also that such sale would have been a fraud on the federal government. There is also evidence to the effect that when this sale *Page 173 
was made the trustee endeavored to sell some of the stock in the Braman trusts at the same price but without success. Neither the executors of the Juilliard will nor the purchaser of the Juilliard estate stock were interested. However, neither sale, in my judgment, affords any criterion of value of the common stock sold by the trustee in March, 1943. Mr. Eldridge, the trust officer of the defendant bank, testified that these sales were a consideration but not controlling in connection with the challenged sale.
The sale to Westaway, of common stock held in the three Braman trusts, left the trustee holding 4,357 shares of preferred stock in complainant's trust, with no voting power and no say in the management of the Juilliard Company. The sale is criticised by complainant because the trustee did not exact some protective measures from the company; but the sale was to the defendant Westaway and not to the company, and the trustee had confidence in the old management whereas in prior negotiations for sale the protective measures suggested and discussed were to safeguard against the new management.
The trustee is also criticised for having made no effort to sell the stock of the Juilliard Company during the first ten years of its trusteeship, and it is claimed that its efforts during the five years preceding the sale were negligible, and that throughout the whole period of the trusteeship the trustee had been negligent in handling the trust assets, particularly that portion of those assets consisting of the Juilliard stock; that the trustee had failed to keep itself informed as to the company's business and finances; had evinced little interest in the conduct of its business; had failed to furnish the complainant with information touching the trust estate to which he was entitled, and had continuously evinced a disposition to dispose of the Juilliard stock at less than its value.
I think it is clear from the evidence that from the inception of the trust in 1928 until 1941 the trustee had made very little effort to dispose of the Juilliard stock although the facts which Eldridge, the trust officer, said motivated the bank in making the sale to Westaway in 1943 had existed during all of that period. It is conceded that no efforts directed toward *Page 174 
a sale were made by the trustee prior to 1941, except for some slight negotiations with Pacific Mills in 1937 which were not of sufficient importance to make any record or memorandum thereof, and except in connection with the sale of the Juilliard estate stock in 1938. It is not difficult, however, to understand why no serious efforts for the sale of the stock were made prior to 1941. During the entire period of the trust, up to that time, the earnings of the company had been very unsatisfactory and its surplus was being constantly depleted. Considering the previous record of the company and the fact that there were two distinct periods of depression during the continuance of this trust, it could hardly be expected that the trustee would endeavor to force a sale which would in all likelihood result in a very considerable loss from inventory value of the stock, especially as the will authorized its retention. When the company began to get out of the red, the trustee became more interested in realizing something out of this non-income-producing asset.
In 1941 the trustee suggested to some of the Juilliard officers that the company be liquidated, but the suggestion was not favorably received and no memorandum of this incident was made.
In February, 1942, there were some negotiations with the Malcolm Chase organization, but these consisted of nothing more than a half hour's conversation with a representative of that company and the result was negative.
In April, 1942, Mr. Eldridge, the trust officer, asked the aid of Lehman Brothers, bankers, in disposing of the Juilliard stock. He knew that the testator had had some negotiations with this firm with a view to marketing the stock in 1926. When Mr. Eldridge again broached the subject it was referred to Mr. Siff, a representative of Lehman Brothers, who made a study of the Juilliard Company and shortly thereafter reported that there was no possibility of marketing the entire holdings of the trustee, and that even if all the stock could be sold the amount realized would probably be little more than par value of the preferred stock. He suggested liquidation of the company and valued the stock at that time at $75 per share for the preferred and $40 per share for the common. *Page 175 
In April, 1942, interest in the purchase of the stock was first evinced by what has been referred to as the McGuire interests. Smith, an officer of Juilliard, brought this to the attention of Mr. Eldridge. The resulting negotiations were not initiated by the bank, but by a lawyer representing the McGuire interests and they were conducted mainly with the company management although Eldridge, representing the trustee, participated therein. These negotiations were for the purchase of the entire stock of Juilliard Company with a view to liquidation. At the inception of these negotiations, Mr. Eldridge said that the trustee would be satisfied if it obtained par for its preferred and common stock, but after a talk with Mr. Westaway it was decided to ask par for the preferred and $175 a share for the common. After long negotiation a price of $135 a share for the common was finally agreed upon, but the negotiations came to naught because the Juilliard officers would not guarantee the company's balance sheet.
After the McGuire negotiations ended there were negotiations with Marshall Field in December, 1942, through one Cushing. These negotiations also came to nothing because they contemplated the dissolution of the Juilliard Company, the formation of a partnership of which Marshall Field was to be a member, and payment of a substantial portion of the purchase price of the stock by a note of Marshall Field, the payment of which would be contingent upon his living until a date some nine or ten months later when he would come into an inheritance. Neither the trustee nor the Juilliard officer stockholders would agree with these terms and the negotiations were dropped.
Also in 1942 there was a suggestion by Smith of the Juilliard Company, to Eldridge, that the Forstman Woolen Company might be interested in purchasing the company. Why Smith thought so does not appear, but nothing was done by anyone about it.
Then in February, 1943, after all previous negotiations had definitely ended, the defendant Westaway offered Mr. Eldridge, the trust officer, $1,000,000 in cash for all of the common stock of Juilliard Company held in the three Braman trusts. He stated that the prior negotiations for the sale of *Page 176 
all of the stock of the company had had a disrupting effect upon the organization, that many of their employees and one whole division or section had left, that competitors were telling customers "don't buy of Juilliard, you won't get any goods, they will be out of business," or words to that effect; and that he had come to the conclusion that it was to his and the company's interest to get the Braman stock off the market. This offer would have given the trustee about $88 per share for the common stock. It was the first offer that the trustee alone had ever had for its stock from anyone. Previous negotiations involved the purchase of all of the stock of the company, both preferred and common, or at least a controlling interest therein for the purpose of liquidation. Notwithstanding the trustee was the largest single stockholder in the Juilliard Company, it held only a minority interest and could not of itself force liquidation. As early as April, 1937, we find counsel for the complainant, in correspondence with a vice-president of the trustee bank, recognizing the fact that the "minority interest" of the Braman family in the Juilliard Company (which was about five times the individual interest of the complainant) was "not readily marketable;" and in a letter dated June 29th, 1937, he stated that "the restrictions on the transfer of the stock do not increase its marketability." And the trustee had been advised by Lehman Brothers, whose opinion was reliable, that there was no possibility of creating a public market for this stock. Subsequent negotiations with Westaway resulted in his increasing his offer to $95 per share, but that final offer was accompanied by an emphatic statement that it was for immediate acceptance "or the entire thing was closed, we could forget it." Following several conferences with other officers of the bank in reference to Westaway's original and final offer, the offer was accepted by Eldridge, the trust officer, on March 10th, 1943. It had been the opinion of the various officers of the bank with whom Eldridge consulted, that if the original Westaway offer could not be improved it should be accepted. This attitude of the trustee in favoring the sale to Westaway reflected its experience over a period of years in endeavoring to find a market for the stock. At every turn of the previous *Page 177 
negotiations the trustee had met with disappointment. Each time a sale seemed assured something happened which ended the negotiations and prevented the sale. In view of this experience it is not surprising that the trustee was discouraged and was eager to close the deal with Westaway even though at a figure somewhat less than had been anticipated in previous negotiations. But these negotiations, it must be remembered, had contemplated a sale of all of the stock of the Juilliard Company, or at least a controlling interest therein, and the evidence is conclusive that for such an interest a higher price could be obtained. The sale to Westaway was of a minority interest and his offer presented the first and only opportunity during the entire trust period that the trustee was in a position to act alone in a sale of the stock. In all previous negotiations, none of which were consummated, the trustee was obliged to act in concert with other stockholders or not at all.
I shall now consider the testimony of the expert witnesses touching the value of the common stock of the Juilliard Company at the date of this sale. The complainant's expert witness, Mr. Mitchell, valued the common stock of Juilliard on March 11th, 1943, at $300.91 per share or 164.4% of the net quick assets value per share which was $183.03 according to Puder and Puder, complainant's accountants. These accountants fixed the value of the common stock on January 1st, 1943, at $291.76 per share on the basis of net worth of the company as shown by previous audits of J.E. Brewer Co. And on the basis of fixed and net current (quick) assets, at $274.32 per share. Mitchell's valuation was on the basis that the purchaser was acquiring control of the company, or at least such an interest as would enable him to force liquidation. He also said that $183.03 per share was the "basic minimum value" per share "regardless of the number of shares sold or the number of people interested," and that that was the value of the minority interest such as here sold. Also that earnings and dividend record "have no place in the establishment of the minimum value of stock," that it was based entirely on quick assets. By another formula, on the basis of the selling price of three comparable mills, he fixed the value of Juilliard *Page 178 
common stock at 183.2% of the net quick assets, which gave a minimum value of $335.31 per share. By still another formula based on net quick assets and current assets and selling prices of thirteen textile companies, he fixed the value of 116.28% of net quick assets, or $212.83 per share. I consider the theoretical values of this witness as fantastic and unreliable. In my opinion there was not the slightest possibility of a sale of stock at any price suggested in his three formulas. The witness did not say that there was any market for Juilliard stock in an amount less than that which would secure control. He was of the opinion that there was a market for a controlling interest and he said that during the period of the McGuire negotiations he had a client who would have bought all of the stock and paid at least the net quick value per share. He kept out of the picture because he did not want to interfere with the McGuire negotiations which were then pending, but, of course, the trustee knew nothing about such a prospective purchaser. I presume the formulas suggested by this witness might be multiplied and limited only by the various combinations of textile companies that could be imagined, with as many divergent resultant values per share of common stock as there were combinations. As a matter of fact, this was plainly demonstrated on cross-examination of Mitchell by taking a combination of five companies — Juilliard, Royal Weaving, Pilgrim, Quissett and Newmarket — and averaging the sales of stock on the basis of net quick assets, assuming Juilliard at 164.4% of net quick, giving a selling price of Gosnold, a sixth textile concern, at 152% of net quick, whereas it had sold for 213%. Then, taking Cleveland Worsted Mills, which had sold at 49% of net quick, Pacific Mills at 49%, Goodall Worsted Mills at 42%, Botany Worsted Mills at 37% and Blumenthal Company at 78%, and averaging the selling price of the five companies at 51% of net quick, would give the value of Juilliard at $93.34 per share, or 51% of $183.03. And so on, adinfinitum.
Charts or schedules submitted by this witness showed that stock of Pacific Mills, listed on the Stock Exchange, sold on March 10th, 1943, for 49% of the net quick assets. During the previous ten years that company had lost an average of *Page 179 
89 cents per share per year on its common stock. During the same period Juilliard had an average loss of $6.95 per share of common. He admitted that to the investor that record would affect the price of the stock and that the effect might be as great as in the case of Pacific Mills. The loss per share of Pacific Mills for the ten-year period was $8.90, for Juilliard it was $69.50. Quissett Mills stock sold in 1943 on the Exchange for 59 3/4, but Mitchell in his calculation gave that stock a value of $105 and said that price was paid by one who bought a controlling interest in the company.
On the other hand, defendant's experts, who have fixed a value of from $83 to $90 per share on the stock, base their finding on a consideration of fixed assets and earnings of the company for a period of from five to ten years preceding the challenged sale.
Mr. Siff, of Lehman Brothers, who had made a study of the Juilliard Company in April, 1942, at the request of Mr. Eldridge, renewed his study in August, 1944, at the request of the defendants. In this further study he considered the earning record of the company for the five-year period — 1938 to 1942 — compared it with a number of other textile companies and, largely because of the increased earnings of the company in 1941 and 1942, he valued the stock as of March 10th, 1943, at from $83 to $90 per share. He based this valuation in part upon the sale price of stocks of comparable textile companies. He expressed his opinion that net current (quick) assets were of negligible importance in appraising the value of common stock because the common stockholder, unless he has a controlling interest, has no way of reaching those assets. In other words, a purchaser of a minority interest could not force liquidation, whereas the purchaser of all of the stock could do so.
Mr. Van Cleef, another expert witness called on behalf of the defendants, appraised the value of the common stock as of March 10th, 1943, at $90 per share. In arriving at this figure he considered the earning record of the company for the previous ten years and stated that anyone interested in purchasing the stock as an investment would want to see a ten-year earning record. He agreed with Mr. Siff as to the *Page 180 
unimportance of the value of the net quick assets in appraising the value of a minority stock interest, and said that the "over-all average ratio of selling price" to "net quick" per share of the fourteen textile companies listed by him was of no value in such an appraisal — that each company must be considered individually and that while all factors should be considered, the "earnings factor" is the most important to the investor. I am in accord with this view.
An investor (not a speculator) in stock (as well as in real estate) is interested in the return which can be obtained from it. A purchaser of any kind of investment property will pay more or less for it depending upon the likelihood of its income increasing or decreasing. Income yield is the most important factor to be considered. Cf. Fidelity Union Trust Co. v. RitzHolding Co., 126 N.J. Eq. 148, 166.
In considering the various negotiations touching a possible sale of the Juilliard stock, it must be borne in mind that practically all of the serious proposals to buy, except Westaway's, came from speculators who sought a quick profit through liquidation. The trustee could not afford to speculate with this stock by holding it when it received a real offer from an investor, and that is what it would have done had it retained the stock. Trustees are not permitted to speculate with trust assets (Wild v. Brown, 120 N.J. Eq. 31), and obviously, the retention of this stock involved a real hazard. A trustee is primarily a conserver and must use the caution of one who has primarily in view the preservation of the estate entrusted to him. 2 Scott on Trusts 924 § 174.
The unreliability of the expert testimony as a yardstick for determining the price at which this stock should have been sold, or rather the adequacy or inadequacy of the selling price, is demonstrated in the complainant's reply brief where he draws attention to stock sales of fourteen textile companies at 57% to 463% of the net quick assets. And he cites examples taken from the testimony of these witnesses to show that stock with the highest yield sold for only 77% of the net quick assets while stock with no yield at all sold for 463%. He further said: "We believe that Van Cleef accurately summed up the situation when he stated, `I don't know as I can answer *Page 181 
you why any particular stock sells at any particular price.'" This statement, with which complainant's counsel agrees, indicated the difficulty in choosing a yardstick for stock values. If the statement is correct, and counsel for the complainant concedes that it is, then the theory advanced by any one of the several expert witnesses might be safely adopted by the court. Theoretical values mean little. When a trustee holding a minority interest in non-income-producing stock desires to sell it for reinvestment of the proceeds, and there is no public market for the stock, he is faced with fact and not theory. And it is likely that he will have to take what is offered or nothing at all. He must sell for what he can get or retain the asset. The real question here is, should the trustee have retained the stock or sold it. After holding it for fifteen years with no income for thirteen, it was, in my judgment, wise to sell even at less thanactual, not theoretical, value if thereby it could be replaced with sound income producing assets. That is what happened here with the result that complainant's income was increased by $10,500 annually, $4,500 of which is tax exempt.
Mr. Mitchell, complainant's expert, frankly admitted that his valuation of this stock was based upon a sale of a controlling interest in the company and the arguments in complainant's brief, relating to the propriety of the challenged sale, are based almost entirely upon the assumption that the defendant Westaway in purchasing this stock was acquiring control of the company. In my judgment the arguments are based upon a false premise. Counsel for the complainant contends that Westaway acquired control because he already had control of 15,020 shares of stock made up as follows:
 Stock held by Westaway ....................... 1,694 shares
 Stock held in trust for Mrs. Westaway ........ 3,000 shares
 Stock in Smith trust ......................... 1,000 shares
 Stock held by Smith .......................... 3,694 shares
 Stock held by Sutphen ........................ 5,632 shares
 ______
 Total ................................. 15,020 shares

Smith and Sutphen are associates of the defendant Westaway and officers of the Juilliard Company, but there is no *Page 182 
evidence justifying the assumption that their stock is subject to Westaway's control. However, by adding the 11,281 shares which were in the three Braman trusts to the above total, counsel for the complainant figures that by this purchase Westaway acquired control of 26,301 shares of stock out of a total of 41,306 shares outstanding. Of course, this would give him a clear majority. But a moment's consideration will show that without the complainant's stock Westaway would have acquired control. The stock in the complainant's trust amounted to 3,755 shares. The balance of the stock sold — 7,426 shares — was held in two other trusts the beneficiaries of which approved of the sale to Westaway. Complainant has no standing to object to the sale of that stock and the beneficiaries thereof do not object. Adding the 7,426 shares of stock held in these two trusts to that of which complainant's counsel contends Westaway already had control, we find that he has control of a total of 22,446 shares, a clear majority of the outstanding stock. Thus Westaway had control without acquiring complainant's stock, and it does not appear that he would not have bought the 7,426 shares in the other two Braman trusts if the trustee had refused to sell the entire block. If it was control only that Westaway was after, and if he had control of the stock held by others as claimed by the complainant, he did not need the complainant's stock. If he did not have control of the stock held by others as claimed by the complainant, the purchase of all of the Braman stock, much less that of complainant's trust alone, would not have given him control. The resulting inference is, therefore, that "control" was not the reason Westaway wanted to acquire this stock but that the real reason was probably that stated by him — the disrupting effect of prior negotiations on the company's organization, c. But assuming that Westaway was acquiring control of the company by the purchase of this stock, that is no reason why he should voluntarily pay more than $95 per share for it.
During the course of the final hearing and near its conclusion, I stated that Westaway was under no duty to the complainant or the trustee which would require him to pay anything more than he was obliged to pay for the stock; that he *Page 183 
had dealt at arms' length with the trustee and had a right to do so. Since then I have read the 1,600-page transcript of the testimony, examined 228 exhibits and considered the voluminous briefs of counsel, but I find nothing therein which changes the impression that I then had. No reason existed so far as I can see, why Westaway should pay any more for the stock than the trustee could obtain for it elsewhere, and the fact is that the trustee never had an offer for the stock from anyone else. Westaway had no competitor. All prior negotiations concerned the sale of all or controlling interest in the company for the purpose of liquidation. The trustee had only a minority interest and could not expect to obtain as high a price for it as it could have obtained for a majority interest. The fact that Westaway by his purchase acquired sufficient stock which, combined with the holdings of other officers of the company, gave control of the company is of no importance here. These other officer-stockholders may or may not co-operate with Westaway in exercising control. It is their privilege to refuse co-operation and there is nothing but unfounded conjecture to support the theory or argument that Westaway acquired control by his purchase. But even if he did, there was no obligation on his part to pay more for the stock than anyone else would pay, and there is not the slightest evidence that he paid less.
As the trustee held only a minority interest and could not force liquidation, the McGuire offer of $135 per share for all of the common stock of Juilliard is of little importance. It was withdrawn when the requested guarantee as to the correctness of the balance sheet was refused by the company's officers. The ensuing O.P.A. suit for $750,000 for price violations, which was ultimately settled for $410,000, shows the wisdom of this request. Had this settlement not been made the liability might have exceeded $1,000,000.
The fact is that stock in a closed corporation which is not listed on the Exchange and for which there is no public market, is worth what it can be sold for — no more, no less. The test of market value is what a willing purchaser would pay to a willing seller who was not acting under compulsion. Here the trustee never had an opportunity to sell its stock *Page 184 
at any price until Westaway made his offer, and he was the only visible customer. In view of the fact that this stock represented a substantial part of the trust assets, that it had produced no income during the entire trust period, and only two sales of Juilliard stock had occurred in fifteen years, and that there was no public market for the stock, it is not surprising that the trustee jumped at the first bona fide offer it received, especially when it was raised to almost par value. If the trustee acted in good faith in accepting Westaway's offer of $95 per share for the trust stock, and I believe it did, it is not chargeable with any supposed loss based upon a theoretical value. Mr. Eldridge, in explaining the trustee's desire to sell the Juilliard stock, said, "The reasons that persisted through the entire time were the lack of marketability, poor earnings, lack of income and desire on the part of the Trustee to diversify the trusts, the investments of the trusts." Mr. Davison, former president of the defendant bank, and honorary chairman of the board at the time of the final hearing stated his reasons for favoring the acceptance of Westaway's offer as follows, "I said among the reasons I thought it wise to sell the stock at the offer we had was that it was extremely difficult to conduct any negotiation covering all the stock because there was a disposition, in my opinion, up-town, not to part with it, and that we were left as a minority holder with no income to our beneficiaries, and here was an opportunity to realize a very substantial sum for their benefit." (By the word "up-town" he referred to the Juilliard management.)
I have hereinabove in considerable detail stated the facts as I find them as it is only by a complete understanding of those facts that the conduct of the trustee can be appraised. Whether, in the light of these facts, the defendant trustee is guilty of a breach of trust is the question which must now be answered. The legal and equitable principles by which the conduct of this trustee must be tested are well settled and cannot be in serious dispute.
"The law requires of a trustee the same degree of diligence and care in the execution of his office that a man of ordinary prudence would exercise in the management of his own affairs."Lewin's Law of Trusts (12th ed.) 327. *Page 185 
To the same effect are the following authorities: 2 Scott onTrusts 924 § 174; Heisler v. Sharp, 44 N.J. Eq. 167; affirmed,45 N.J. Eq. 367; Corle v. Monkhouse, 50 N.J. Eq. 537;Pfefferle v. Herr, 75 N.J. Eq. 219; Smith v. Jones, 89 N.J. Eq. 502; In re Leonard, 107 N.J. Eq. 235, 237; In re CornExchange National Bank, 109 N.J. Eq. 169; Harris v. GuaranteeTrust Co., 115 N.J. Eq. 602; Liberty Title and Trust Co. v.Stevens, 115 N.J. Eq. 506; People's National Bank and Trust Co.
v. Bichler, 115 N.J. Eq. 617; In re Pettigrew, 115 N.J. Eq. 401;In re Megargee, 117 N.J. Eq. 347; In re Cross, 117 N.J. Eq. 429;Willson v. Tripp, 124 N.J. Eq. 45; In re Griggs, 125 N.J. Eq. 73; Sheridan v. Riley, 133 N.J. Eq. 288; In re Hazeltine,119 N.J. Eq. 308.
In Heisler v. Sharp, supra (at p. 172), the Vice-Ordinary said:
"All that the respondents (executors) were required to do, was simply to do what any man of ordinary prudence and caution would, under like circumstances, have done. So long as an executor acts in good faith, and with ordinary discretion, and within the scope of his powers, his acts cannot be successfully assailed. No man is infallible; the wisest make mistakes; but the law holds no man responsible for the consequences of his mistakes which are the result of the imperfection of human judgment, and do not proceed from fraud, gross carelessness or indifference to duty."
This admirable statement of fiduciary law was approved by the Court of Errors and Appeals as the decision of the Prerogative Court was affirmed on the opinion of the Vice-Ordinary, and it has since been repeatedly quoted with approval by this court and the Court of Errors and Appeals, as a perusal of the above cited cases will show.
Of course, a trustee has a duty of loyalty to the beneficiary of the trust, but that duty does not justify him in acting against his own judgment, for the responsibility is the trustee's and not the beneficiary's. 2 Scott on Trusts 656 § 170.
"As long as he (a trustee) is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care and skill and caution." 2 Scott on Trusts, 909 §170.25. *Page 186 
At p. 926 the same author says:
"It may be, however, that a particular trustee has greater skill or more facilities than those of the ordinary prudent man. In such a case he is under a duty to exercise the skill that he has and to employ the facilities which are available to him. If he is in a position to do better than the ordinary man, it is not enough to do what the ordinary man would do."
But there is no evidence in this cause to indicate that the trustee did not fulfill all the requirements thus laid down. A trustee is not a guarantor of value of securities, and if a failure to sell or delay in selling resulting in a loss is not due to the fault of the trustee, it is not liable to surcharge.2 Scott on Trusts 930 § 174.1. Conversely, if in the light of subsequent events, a trust asset is sold prematurely the trustee is not liable to surcharge if he acted reasonably and in good faith. People's National Bank and Trust Co. v. Bichler,supra. The affairs of corporate trustees are managed by individuals who are subject to human errors and frailties and history records but one perfect Man. So long as these individuals act in good faith and in accordance with the rules of conduct hereinabove recited, the corporation for which they act cannot be condemned.
The evidence showed a substantial increase in the earnings of the Juilliard Company for 1943 and 1944 and a corresponding increase in surplus. This fact is stressed as indicating an error in judgment on the part of Eldridge, the trust officer, who said he did not anticipate a continuance of the war profits beyond 1943. It shows only that hindsight is better than foresight.People's National Bank and Trust Co. v. Bichler, supra. And trustees are not liable for losses resulting from mere errors in judgment. In re Griggs, supra.
In my opinion the defendant trustee committed no breach of trust in making the challenged sale of stock but on the contrary acted wisely and in the best interests of the complainant beneficiary in converting a non-income-producing asset into sound and productive investments. *Page 187 
 SECOND CAUSE OF ACTION.
The allegations of the bill under this head, to the effect that the proceeds of the challenged sale were received on March 11th, 1943, but not invested until June, 1943, are admitted, but the delay is explained by the fact that immediately after the transaction was closed a controversy arose as to the legality of the sale in view of the above quoted provision of the by-laws of the Juilliard Company that no sales of stock should be valid without a first offering to the company and upon its declining to purchase, then to the stockholders. One of the stockholders of the company, a beneficiary of one of the Braman trusts which had terminated, invoked this by-law as a result of which the formality of offering the stock to the company and then to the stockholders was observed; but neither the company nor any of the stockholders exercised the option given them by this provision of the by-laws. At the time of the final hearing it appeared that the stockholder who invoked this by-law desired to purchase some of the stock but there was a dispute as to the amount which he was entitled to purchase and the matter was still open. Pending the outcome of the controversy touching the right of the company or of individual stockholders to participate in this purchase, the trustee, acting upon the advice of counsel, refrained from investing the funds. When it appeared that neither the company nor any of the stockholders, other than the one invoking the by-law, wanted to purchase any of this stock, counsel advised the trustee that it would be safe in investing the funds and investment was completed on June 29th, 1943. The resulting increase in the annual income of complainant's trust was of substantial benefit to him and in my judgment fully justified the sale.
It is conceded that a trustee owes a duty to invest trust funds within a reasonable time after they are received, but what is a reasonable time depends upon circumstances. Measured by this standard, periods of three months, six months and one year have been held to be reasonable. 1 Perry on Trusts (3d ed.) 577 §462. The failure to invest may be *Page 188 
justified by the fact that it is doubtful whether the funds belong to the trust estate. 2 Scott on Trusts 966 § 181. That was the situation here and, under the circumstances, I fail to see any impropriety or neglect in the delay in the reinvestment of these trust funds.
 FOURTH CAUSE OF ACTION.
The allegations in the bill touching the loans of defendant bank to Juilliard Company are admitted. The first loan of a half-million dollars was made in 1937. The highest amount borrowed from the bank by the company at any one time amounted to $2,400,000, and the loans were paid in full in December, 1941. Interest on these loans was charged at the rate of 1 1/2% and the bank collected $62,773.96 in interest during this period.
The Juilliard Company had been a depositor in the trustee bank since 1922 and continued so until the day of the final hearing. While the company had not borrowed from the bank prior to 1937, there is no evidence indicating that the loans which had their inception in that year resulted from the fact that the bank as trustee held a large block of stock in the company. In fact, the testimony of Mr. Eldridge, the trust officer, and Mr. Davison, the former president of the bank, and Mr. Westaway, the president of the Juilliard Company, was to the contrary. On the day of the first loan the company had been a depositor of the bank for fifteen years. It was the bank's money, not that of the trust estate, which was loaned, and the opportunity to make the loan did not arise from the trust relationship. These loan transactions are criticised on the ground that the resulting debtor-creditor relationship was inconsistent with the bank's trusteeship. But such a relationship had existed since 1922 and was in existence at the date of testator's will and at his death. And while "a trustee may not take a position whereby self-interest might induce him to relax the obligation he owes to the cestuis, or would pit his own advantage against their welfare" (In re Westhall, 125 N.J. Eq. 551, 554; Marshall v.Carson, 38 N.J. Eq. 250; Staats v. Bergen, 17 N.J. Eq. 554), the *Page 189 
loans to the Juilliard Company, in my judgment, involved no self-dealing and no breach of trust. It is worthy of note that not a single pertinent authority is cited by complainant's counsel in support of this cause of action. Most of the cases cited and relied upon involved the use of trust funds by the trustee for the profits on which a trustee is, of course, liable to account. But that is not the situation here. Other authorities deal with the mishandling of estate assets through interlocking directorates or otherwise. One of the cases relied upon, Keely
v. Black, 90 N.J. Eq. 439, was reversed on appeal, 91 N.J. Eq. 520.
Even on loans to the trust estate for necessary expenses a trustee is entitled to interest. 2 Scott on Trusts 896 §170.20.
 THE CASE AGAINST WESTAWAY.
The claim against the defendant Westaway that the challenged sale of the stock to him was the result of a conspiracy between the seller and the purchaser finds no support whatever in the evidence submitted in this cause. Conspirators usually act with the utmost secrecy. The contrary was the situation here. The complainant was kept fully advised of all of the negotiations which resulted in this sale. Immediately after this defendant had made the offer of $1,000,000 for all of the common stock held by the trustee in the Braman trusts, he telegraphed this information to the complainant at Palm Beach, Florida. On the following day, Mr. Eldridge, the trust officer, wrote a long letter to the complainant and to the life beneficiaries of the other two Braman trusts, advising them of the facts. The offer was made on February 24th and the telegram sent on the same day. Mr. Eldridge's letter was dated the following day. The sale was not consummated until March 11th, and, in the meantime, there had been several conferences with those interested. Counsel for the complainant had discussed the matter with Mr. Eldridge and had written him a letter in which he approved of the continuation of the negotiations. On March 10th, the day of Westaway's final offer, Eldridge attempted to contact the complainant by telephone before the offer was accepted, but was *Page 190 
unable to do so and, for reasons already stated, after consultation with Mr. Davison, he accepted the offer.
On March 10th, 1943, the morning of the sale to Westaway, two men, Mr. Steefel of Stroock Stroock, and a Mr. Mossman called on Mr. Davison, the chairman of the board of the defendant trustee, and stated that they had a client who was interested in purchasing all of the common and preferred stock of the Juilliard Company. Mr. Davison told them that that would require from $12,000,000 to $15,000,000, and they said that their client could produce that amount of cash and that the sale, if made, would be without cost to the sellers. A sale at $12,000,000 would have netted between $150 and $160 per share for the common stock, and at $15,000,000 approximately $225 per share. They did not disclose the identity of their principal and Mr. Davison evidently gave them a polite brush-off. About an hour later Westaway's offer was accepted. This episode is claimed to be evidential of the alleged conspiracy with Westaway and of misconduct on the part of the trustee but in appraising the trustee's conduct at that time it must be borne in mind that, after a consultation of four of its officers, it had already decided to accept Mr. Westaway's offer of $95 per share for the common stock and that that was the first and only definite offer that had been made to the trustee for such stock, all other negotiations having contemplated a sale and purchase of all of the capital stock, both common and preferred, of the company, in which negotiations the trustee could not act alone. In the light of past experiences in these negotiations it is not surprising that the trustee chose to keep the bird in the hand rather than pursue the one in the bush, and especially so because of Mr. Eldridge's understanding that the deal with Westaway had to be closed before March 15th.
The evidence also showed that some six months after the challenged sale of stock was consummated the "McGuire Interests" renewed negotiations with the defendant Westaway for the purchase of all of the stock, both preferred and common, of the Juilliard Company and Westaway then demanded $150 per share for the common, which was $15 per share higher than the price agreed upon in the previous negotiations. *Page 191 
It is also argued that this fact is proof of the alleged conspiracy and the six months period is said to have great significance because of income tax provisions touching capital gains. But these negotiations again contemplated the sale and purchase of all of the stock and not a minority interest therein. "War profits" had then continued for the six months period and it was upon this basis that the price was advanced. However, these negotiations also failed, and for the same reasons that resulted in the previous failure. I cannot attribute to this episode the significance or importance claimed for it by counsel for the complainant. I think it is clear that the challenged sale was not a result of any conspiracy.
It is also urged by complainant that the trustee in making this sale committed a breach of trust of which the defendant Westaway had notice. This is based upon the assumption that Westaway knew that the trust company was selling the stock at an inadequate and unconscionable price. To hold Westaway liable on this theory I must first find that a breach of trust was committed by the trustee. I have already held to the contrary. In my judgment Westaway was a bona fide purchaser for value without notice of any breach of trust and is not chargeable with any supposed losses of the complainant, and the sale is not subject to attack.
 REMOVAL OF THE TRUSTEE.
The prayer for the removal of the trustee is based not only upon the alleged breach of trust in the sale of stock of the Juilliard Company held in complainant's trust, but also upon charges of misfeasance, antagonism toward complainant, lack of loyalty, good faith and reasonable discretion in the management of the trust estate, and failure to furnish complainant with information touching the trust assets and their administration. I have already held that the trustee was not guilty of a breach of trust in selling the stock; but it is not altogether blameless. It cannot be said that it at all times treated the complainant with that courtesy and consideration to which he as a beneficiary of a million dollar-plus estate was entitled. Nor was the administration of the trust estate undeserving of *Page 192 
all criticism. There were times when the complainant asked for information to which he was entitled and which he obtained only after persistent demands, and there was lacking that complete understanding co-operation between trustee and cestui that should characterize efficient trust administration. Also, the trustee at times displayed greater loyalty to the management of the Juilliard Company than to its cestui que trust. This attitude was criticised by complainant's counsel in a letter addressed to one of the trustee's vice-presidents in July, 1937.
On the surface the relations between the trustee and itscestui were cordial, but there was an undercurrent of distrust on the part of the cestui and an attitude of irritation and assumption that "the king can do no wrong" on the part of the trustee. I think some of the difficulty arose from the fact that at one time during his father's lifetime the complainant had been the managing executive of one of the northern mills of the Juilliard Company, but he had no part in the business management during the trust period, or most of it. However, he evidently desired to have some part in the management of the company in which he had a substantial interest, and perhaps justifiably so, and he sought a position on the board of directors, offering Westaway full co-operation of the Braman interests for the satisfaction of this ambition. Mr. Westaway was courteous but evidently unimpressed and certainly unpersuaded. I believe this situation was a factor influencing Westaway to purchase the Braman stock.
In September, 1933, Mr. Davison, who was then the president of the trustee bank, was elected to the board of directors of the Juilliard Company and he remained on the board until after the date of the challenged sale of stock. There can not be the slightest doubt but that he was elected to that board as a representative of the bank in its capacity as trustee under the Braman will notwithstanding his denial and Mr. Eldridge's denial of that fact when on the witness stand. Why they denied this in the face of the overwhelming evidence supporting the fact is beyond comprehension. The false position thus assumed does not commend itself to a court of conscience. And although a member of the board, Davison *Page 193 
was one of those directors who do not direct. In his ten years of service on the board his attendance at board meetings was infrequent, it does not appear that he ever took part in any business discussion except once, and then he was admittedly on the wrong side — and he never saw a company balance sheet. A more perfect example of a "dummy director" it would be difficult to find. Of course the Braman family was not without representation on the board, but that did not excuse the inaction of the trustee's representative. However, there is one episode touching Davison's representation of the trustee, and the beneficiaries of the Braman trusts of which the complainant was one, on the Juilliard board which more than anything else brands the administration of this trust with gross carelessness or incompetence.
In 1931 or thereabouts the complainant asked the trustee to obtain for him a financial statement of the Juilliard Company. Such a statement was furnished the complainant about a year and a half later, and only after repeated demands. The statement furnished consisted merely of an abbreviated or condensed balance sheet, or as defense counsel termed it, "a consolidated balance sheet." One item on this balance sheet, an item marked "due from officers and employees," provoked inquiry by the complainant. The amount thus shown to be due the company was approximately $1,000,000. After repeated demands for information touching this item the complainant was advised by Eldridge that it represented moneys due the company under a stock purchase agreement made with four of the company's employees. That statement was only partly true. As a matter of fact, the item represented not only amounts due the company under the stock purchase agreement but also cash loans made to some of the directors and officers of the company, and there is evidence that Eldridge knew this. In subsequent financial statements received by the complainant the amount varied and at one time amounted to $1,200,000, but it was the subject of much discussion and correspondence between the trust company and the complainant, his counsel and other representatives of the Braman interests over a period of years. It finally developed that although carried as an asset on the company's books it *Page 194 
was not considered as an asset at all by the officials of the company. As a result of the controversy over this item it was finally eliminated from the statement of the company assets and investigation showed that the company's claim against these officers and directors for cash loans was canceled in 1938. This resulted in a derivative stockholders suit brought against the directors of the Juilliard Company by the complainant and another in the New York Supreme Court, in which judgment was entered against seven of the directors including the defendants Westaway and Davison, former president of the trustee bank and the trustee's representative on the Juilliard board. Braman v.Westaway, 60 N.Y. Supp. 2d 190. Mr. Justice Pecora, speaking for the New York Supreme Court, described the transaction as follows:
"The evidence as to the second cause of action establishes a waste of corporate assets for which liability must be enforced. As has been shown, after the execution of the forfeiture agreements on March 12th, 1942, the entire personal loan indebtedness due to Juilliard from Retz, and a portion of that due from Schwarz, were canceled by applying as credits against such debts, the stock purchase bonuses and dividends. The explanation advanced by defendants for such action, is unsatisfactory. The officers and directors completely disregarded their fiduciary duty to stockholders and ignored and violated the provisions of the stock forfeiture agreements by permitting funds which had been specifically earmarked for payment against stock purchases to be wrongfully applied against the personal loan indebtedness of Schwarz, Retz and Parker. Juilliard thus lost substantial assets by the cancellation of the loan indebtedness. The transactions constituted in effect gifts to Schwarz, Retz and Parker. Any claim that by so doing the corporation did not lose more than 5 per cent. because it was subject to a 95 per cent. excess profit tax cannot be considered. Corporate assets cannot be wasted upon any such unconscionable theory. No director will escape liability by attempting to show that the United States Government eventually sustained the loss instead of the corporation. The loss sustained by the corporation was the amount of the indebtedness of Schwarz in the sum of $271,544.61; the *Page 195 
indebtedness of Retz in the sum of $28,062.65 plus the $72,150 paid him; and the indebtedness of Parker in the sum of $4,544.21."
 * * * * * * *
"The defendants Westaway, Smith, Sutphen, Retz, Chester A. Braman, Jr., and Hobbs are clearly liable for the action taken with respect to the reduction and cancellation of the loan indebtedness. As to the defendant Davison the evidence does not warrant a conclusion that he participated in, or knew of the manner of the reduction and cancellation of the loans to Schwarz and Retz. Nor can he be charged with nonfeasance in regard to them. However, although Davison was not present at the meeting of the board of directors on June 15th, 1938, where the president was authorized to settle Parker's objections with the representatives of his estate, Davison was present at the next meeting of the board on September 20th, 1938, at which the minutes of the previous meeting were read and approved. This fact, together with the duty which devolved upon him as a director to know what was transpiring, makes him liable for the loss sustained in canceling Parker's debt."
This recital of facts touching this transaction reflects no credit upon the trustee's representative on the Juilliard board. The transaction resulted in a loss to the company, according to the figures given in the above excerpt of opinion, of $376,301.47 in which the Braman estate had a 28% interest and the complainant a one-fifth interest in that. If Davison did not know what was happening he was just as derelict in his duty as though he had participated in the complete transaction, because it was his duty to know and his duty to report his knowledge to the trustee, and the trustee's duty in turn to report its knowledge to its beneficiaries including the complainant. And the trustee is, of course, responsible for any dereliction of duty on the part of its agent. The above cited decision of the New York Supreme Court, on reargument, was modified and the directors were relieved of liability for the Parker transaction solely on the ground that action thereon was barred by the statute of limitations. 59 N.Y. Supp. 2d 509. While Davison escaped personal liability *Page 196 
in that action, the facts show a gross neglect of duty amounting to a breach of trust and the trustee cannot here be relieved of responsibility for the dereliction of its representative on the Juilliard board. It is assumed that the company's losses resulting from this transaction will be made good. What the complainant's loss resulting therefrom amounted to does not appear and no claim for such loss is made here; but the breach of trust resulting from Davison's dereliction in this affair is one of the grounds upon which its removal is sought.
"The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if no other reason than that human infirmity would prevent the co-trustee or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out, or are greatly exaggerated."
This excerpt from the opinion of Mr. Justice Gray in May v.May, 167 U.S. 310, is quoted with approval by Vice-Chancellor Stevens in Lister v. Weeks, 60 N.J. Eq. 215, 228; by Vice-Chancellor Backes in Starr v. Wiley, 89 N.J. Eq. 79; and by Vice-Chancellor Sooy in McAllister v. McAllister, 120 N.J. Eq. 407,420. It was approved by the Court of Errors and Appeals by its affirmance in McAllister v. McAllister, 121 N.J. Eq. 264.
In Lister v. Weeks, supra, Vice-Chancellor Stevens said:
"Of course, friction or hostility between trustee and beneficiaries is not of itself a reason for the removal of the trustee; but where that hostility has arisen out of the misbehavior of the trustee it may be. Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate."
And see Restatement of the Law of Trusts 279, 280 § 107 ¶ (a) and ¶ (c).
But "Courts are reluctant to remove an executor or trustee without clear and definite proof of fraud, gross carelessness *Page 197 
or indifference." In re Hazeltine, 119 N.J. Eq. 308, 314;affirmed, 121 N.J. Eq. 49. And "a trustee will not be removed for every violation of duty. For acts done in bad faith, or that have diminished or endangered the trust fund without bad faith, it is the duty of the court to remove him." Lothrop v.Smalley's Ex'rs, 23 N.J. Eq. 192; McAllister v. McAllister,supra.
In In re Bailey's Estate, 159 Atl. Rep. 549 (at p. 551), the Supreme Court of Pennsylvania said:
"It is a serious matter to dismiss trustees appointed by will; much more should be shown by those who wish them dismissed than would be the case where the trustees are appointed by the court.Perry on Trusts (6th ed.) 276, says: `The power of removal of trustees appointed by a deed or will ought to be exercised sparingly by the courts. There must be a clear necessity for interference to save the trust property. Mere error or even breach of trust may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity putting the trust in jeopardy.'"
The question touching the removal of the trustee must be answered in the light of these authorities. And while the power of removal is exercised sparingly and with great caution (Story
v. Palmer, 46 N.J. Eq. 1, 10) and perhaps with greater caution in the case of a testamentary trustee (Perry on Trusts (6thed.) 276), I believe the conduct of the defendant trustee evidences either such incompetence or gross carelessness in the management of complainant's trust as to warrant its removal. The fact that the trustee has in this proceeding been exonerated from liability with respect to the challenged sale of stock, and with respect to the second and fourth causes of action, presents no alibi to the charges of antagonism, lack of loyalty, good faith and reasonable discretion, refusal of co-operation and actual misfeasance in connection with the cancellation of debts "due from officers" and directors. In my judgment the proved derelictions of the defendant trustee warrant its removal.
I will advise a decree in accordance with these conclusions. *Page 198